# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1868.

CARLISLE and others *vs.* COOPER.

1. The courts of this state have, by analogy to the statute relating to title to other real property, adopted twenty years as the term for acquiring an easement by enjoyment. The adverse enjoyment must have been continuous, and to the full extent for the whole of the time.

2. In case of a dam, the easement acquired is not the right of maintaining a dam or structure upon the land of the party himself, but the right to flow back the water on the land of his neighbor. His neighbor has no right of action for the mere building of the dam, unless it throws the water back upon his land; his suffering it is no acquiescence in anything from which a grant or permission can be presumed.

3. No one is bound to measure the dam of an adjoining proprietor, and employ an engineer to calculate whether, if kept tight and full, it will throw water upon him. But when it does throw water upon him, if he permits it for twenty years, a grant will be presumed; but this only to the extent to which his land was habitually or usually overflowed.

4. The rule is that any interruption of enjoyment during the acquisition of an easement, that is within the twenty years, will defeat the acquisition. After the acquisition is complete, no interruption or cessation, except for

twenty years, or with a plain intention to abandon, will destroy the easement.

5. When the dam is a permanent structure, it is not necessary that the water should be kept constantly in it, to its full capacity ; nor that it should be always kept in perfect repair. It is the height of the water as ordinarily kept in the dam, when kept in repair as dams are kept for profitable and economical use, that will fix the height acquired by prescription. If a dam is permitted for one or more years to be out of repair, so as not to injure the land above it, that time will not be counted in the prescription ; the prescription is interrupted, and must commence anew.

6. This rule must apply only to such dams as are permanent, and to such gates and movable parts as are constantly used and kept in their places to raise the height of the water. Boards or gates that are only used in seasons of low water, so as to increase the water in a mill pond, without overflowing the lands above, and used at intervals only, cannot gain the right to keep the dam at the height to which they raise it, if that will make the level of the water upon the lands of the upper proprietor higher than maintained for the period of twenty years.

7. When an easement to flow water is claimed by adverse enjoyment, the whole burthen of proof is on the claimant.

This cause was argued upon the pleadings and proofs, at a special term, held at Morristown, in July, 1868. The facts of the case sufficiently appear in the opinion of the Chancellor.

*Mr. Pitney,* for complainants.

*Mr. Vanatta* and *Mr. Shipman,* for defendant.

The Chancellor.

The object of this suit is to abate an injury or nuisance in overflowing the lands of the complainants, by back water, occasioned by the dam of the defendant ; also to ascertain and settle the height at which the defendant is entitled to maintain his dam, or to back the water upon the land of the complainants.

That this court has jurisdiction for both these objects, was settled in a decision in this cause upon a motion to dismiss the bill, which was, by consent of parties, argued and de-

cided, as if the question had been raised upon a demurrer to the bill.

The evidence has been prepared with great care and labor on both sides, and although its volume, which extends to nearly two thousand printed pages, and the expense of taking it may seem disproportionate to the value of the property in controversy, yet most of it has a direct bearing upon the questions in controversy.

The bill alleges that the complainants, as devisees of Thomas M. Carlisle, deceased, own a farm in the township of Chester, in the county of Morris, bounded on Black river, and that they are entitled to have the river flow along the same in its natural and accustomed channel, free and clear of all obstructions. It alleges that about half a mile below the farm, the defendant has a dam across the river, which, prior to the year 1846, in no wise affected, obstructed, or retarded the flow of the river, at any point along complainants' farm, to their knowledge or belief; that the defendant, in 1846, increased the height of his dam about three feet, by which the water of the river is made deeper all along the complainants' farm, and parts of the farm overflowed by it. The prayer of the bill is, that the height to which the defendant raised his dam in 1846, may be ascertained by the court, and that the defendant may be compelled to reduce the dam to the height at which it was before 1846, and concludes with the usual general prayer for relief.

The defendant admits, and the evidence shows, that the dam of the defendant flows back the water of the river upon the lands of the complainants, higher than it would flow by the natural course of the river; and he places his defence upon the right acquired to do this by prescription, or by having so flowed back the water for more than twenty years. The proof shows that from 1852, about fourteen years before the filing of the bill, the dam, and water in it, has been maintained at the height maintained by the defendant; it was so maintained by movable gates, put upon the mudsill of the tumbling dam. Before 1852, the tenants who occupied the mill varied much in the use of these gates. They generally,

except in freshets, when to do so was dangerous, kept these gates down, and raised the water in the dam to the height of the gates. This left a space between it and a cap-piece above it, through which the water flowed. Some of the tenants used boards, or false gates, which were put on the top of these regular gates, at times when the water was low; some, at times, filled up the whole space, and made the water flow over the cap-piece; others did not, but suffered the water to run under the cap piece. There is also evidence tending to show that at some time within the twenty years the cap-piece itself was away, and the water was kept back by loose boards placed on the mudsill, against pins driven in holes bored in the mudsill for that purpose.

The question then arises, whether, by such use of a dam for more than twenty years, a right is gained by prescription to maintain the water constantly and permanently, as high as it would be kept by a tight dam at the height of this cap-piece; or whether the right acquired is only to the height of the regular gates, kept up constantly and regularly, except during freshets, for the whole of the twenty years. These lower gates may, without difficulty, be considered a part of the regular and fixed dam, and twenty years' continuous use of them would give a right to maintain them, except during freshets or high water.

There is in this state, no statute of limitation by which an easement may be acquired; but the courts have, by analogy to the statute relating to title to other real property, adopted twenty years as the term for acquiring an easement by enjoyment. In adopting this they adopt all the other requisites in the statute, and annexed to it by construction. This would require that the adverse enjoyment must have been continuous, and to the full extent for the whole of the time. The possession or enjoyment of part, with a claim to the whole, is not sufficient. It is not sufficient that a person entering upon lands, has entered more than twenty years ago, if there have been one or two years in which he has had no possession within the twenty years. The possession must

be continued. The same rule must apply to the acquisition of easements.

In case of a dam, the easement acquired is not the right of maintaining a dam or structure upon the land of the party himself, but the right to flow back the water on the land of his neighbor. He may build on his own land a dam of any height, provided it flows back no water. His neighbor has no right of action; his suffering it is no acquiescence in any thing from which a grant or permission can be presumed. And the prescription, to be valid, must be to flow back the water, by having done so for twenty years. No one is bound to measure the dam of the adjoining proprietor, and employ an engineer to calculate whether, if kept tight and full, it will throw water upon him. But when it does throw water upon him, if he permits it for twenty years, a grant will be presumed; but this only to the extent to which his land was habitually or usually flowed.

This principle is founded on the reason upon which the prescription for easements is based, and is sustained by the weight of authorities; although some opinions and decisions are found to the contrary, making the height at which a dam was built, and kept for twenty years, the measure of the extent, although it had not been kept or used so as to back water on the adjoining lands.

The Supreme Court of New York, in the case of *Stiles* v. *Hooker*, 7 *Cow.* 266, hold that it is the height of the water, not of the dam, which gains the right by prescription. In *Mertz* v. *Dorney*, 1 *Casey* 519, the Supreme Court of Pennsylvania hold the same doctrine. In Connecticut, in *Branch* v. *Doane*, 17 *Conn.* 402 and 18 *Conn.* 233, the court adopts it. In the opinion in the Court of Errors in this state, in *Cooper* v. *Carlisle*, 2 *C. E. Green*, 525, it is declared that the acquiescence to bind must be acquiescence in the flowing of the water, and not in raising of the dam.

In *Monmouthshire Canal Co.* v. *Harford*, 1 *Cromp. M. & R.* 614, the English Court of Exchequer hold that the enjoyment must be continued and uninterrupted; that if they

had enjoyed for one week, and not for the next, and so on alternately, their plea would not be proved. In *Pollard* v. *Barnes*, 2 *Cush.* 191, the judge, on the trial, had charged that in a claim of an easement to pile logs on another's land, an omission to pile for one or more years, without intention to abandon the claim, would not prevent the acquiring title by prescription; but the Supreme Court sustained the exception, and declared that whatever affects the continuity of enjoyment of an easement, as a cessation to enjoy it, destroys the effect of the previous user.

In *Dana* v. *Valentine*, 5 *Metc.* 13, the court, on the other hand, held that omission, for two years in the twenty, to exercise an offensive trade, did not prevent the title by prescription. The opinion is placed on the ground that there was no evidence of the intention to abandon; it is a clear misapplication of the doctrine that after a right is acquired by prescription it will not revert by non user, except with intention to abandon, and the authorities relied on are only on that point. The rule is that any interruption of enjoyment during the acquisition of an easement, that is within twenty years, will defeat the acquisition; after the acquisition is complete, no interruption or cessation, except for twenty years, or with a plain intention to abandon, will destroy the easement.

Again, in *Cowell* v. *Thayer*, 5 *Metc.* 253, it is held that the efficient height of the dam, at which it has been kept for the twenty years, will determine the height at which the water may be kept. This decision is approved of in *Ray* v. *Fletcher*, 12 *Cush.* 208, with some modifications, the court holding that it was not the actual height of the dam, but its efficient height, according to its structure and operation to maintain the height of the water when in repair and good order, that regulates the prescriptive right.

But in Massachusetts, the law regulating dams and the recovery of damages, depends, to a certain extent, upon their peculiar statutes. These permit any land owner to erect a dam, throwing back water upon the proprietor above, and

the damages are ascertained and assessed by a jury, impanneled for that purpose; and the courts may well presume that the damages were assessed on the basis of the overflow by the efficient height of the dam, if kept up and in good repair. The right to overflow is not then acquired by prescription, but it is a defence to any greater damages than those occasioned by the dam as originally constructed.

So in England, in *Carr* v. *Foster*, 3 *Ad. & El.* (*N. S.*) 581, the Court of Queen's Bench held that omission to use common of pasture for two years would not prevent title from accruing by prescription. But that was under Lord Tenterden's act, 2 and 3 *Will. IV.*, ch. 71, which provides that no interruption, except acquiesced in for one year *after notice* of the interruption and by whom made, shall prevent title from accruing by prescription.

The whole object of requiring twenty years instead of six or two for acquiring title to lands by possession, and to easements by enjoyment, will be frustrated if the title can be gained by enjoyment at intervals during the twenty years, intermitted without any evidence of intention to abandon. And in no case is it permitted to annex the possession of lands, or the enjoyment of an easement at one time, with such possession or enjoyment at another time, so as to make up the twenty years. In states where effect is given to the enactment, that the time during which disabilities exist shall not be computed as part of the period of limitations, the period of intervening disability is deducted from the term of continuous enjoyment, and the residue counted. That interruption is not to the continuity of the enjoyment, but of the operation of the adverse possession.

When the dam is a permanent structure, it is not necessary that the water should be kept constantly in it, to its full capacity; the daily use of the water will vary its height. Nor is it necessary that it should be always kept in perfect repair; but it is the height of the water as ordinarily and usually kept in the dam, when kept in repair as dams are kept for profitable and economical use, that will fix the

height acquired by prescription. If a dam is permitted for one or more years to be out of repair, so as not to injure the land above it, that time will not be counted in the prescription; the prescription is interrupted, and must commence anew.

This rule must apply only to such dams as are permanent, and to such gates and movable parts as are constantly used and kept in their places to raise the height of the water. Boards or gates that are only used in seasons of low water, so as to increase the water in the mill pond, without overflowing the lands above, and used at intervals only, cannot gain the right to keep the dam at the height to which they raise it, if that will make the level of the water upon the lands of the upper proprietor higher than maintained for the period of twenty years. Such boards may be used for twenty years with such care and judgment as to do no injury to the lands above, and when permanently added to the dam destroy them. *Marely* v. *Shultz*, 29 *N. Y. R.* 346.

These rules thus fixed, will much facilitate and simplify the labor of examining the mass of evidence in this cause.

The answer of the defendant admits that at the time of filing the bill in this case, September 17th, 1866, the dam was higher than he had a right to maintain it, by nine inches, which it states was the height that it was raised in 1846; and it further states that between the filing of the bill and answer, and on the 23d day of November, 1866, the defendant reduced the height of the dam nine inches, so that it is now of the same height as it was before it was raised in 1846. So the question is, whether the defendant is entitled to maintain the dam at this reduced height.

The burthen of proof in this case lies on the defendant. The complainants, as owners of the fee of the lands above, have clearly the right to have the river kept at its natural height, and in its natural channel along their land, unless the defendant can show, by grant or prescription, a right to flow back at a greater height.

The dam was erected on the site of an ancient dam, in

1827, by Nathan Cooper, the uncle of the defendant, who devised it to the defendant, at his death, in 1834. The defendant contends that the dam erected in 1827, with an addition put upon the tumbling dam, in 1828 or 1829, was substantially the same that it now is. All agree that the height of the water in the pond and in the river along the complainants' farm, is regulated by the tumbling dam. This consists, as it is since reduced, of a stone wall and a piece of timber about thirty-six feet long, lying on the stone-work, called the mudsill, with a cap-piece above it, supported by five posts, one foot long. This intervening space is now filled up at the ends by solid planking, and in the middle, for twenty-four feet, by movable gates, filling the whole space; these are usually kept down, except in freshets or extraordinary high water, when they are raised to allow the water to run off more rapidly.

The alterations made in the dam in November, 1846, were within twenty years before the commencement of this suit, and this makes it necessary, in order to maintain title by prescription, that the defendant should show user before that change.

The main controversy upon the facts is, as to the extent of that change, and the use of the dam before it.

The complainants contend, that at that change the mudsill was raised nine inches higher than it was before, and that, by the superstructure placed upon it, consisting of posts twenty-one inches high, and a cap-piece nine inches thick, and the boards which were afterwards fixed so as to fill the space below the cap-piece, the height of the dam was raised some three feet higher than before, and remains now, after the reduction in 1866, two feet three inches higher than it should be; or, even if a right was acquired by the use of gates on the old mudsill between 1827 and 1846, of eight or ten inches wide, that the height is more than twenty inches above what it should be.

The defendant contends, that the present mudsill, which he admits was placed there in 1846, is of the same height as

the one which had been there from 1827, and that the cap-piece and superstructure is, since reduced in 1866, of the same height as the like superstructure which was placed there in 1828 or 1829, and maintained until 1846; and that ever since it was placed there, gates of nine or ten inches wide have been placed upon the sill, and loose boards, or flush boards, have been used by the occupants of the mill at their pleasure, to fill up the interval between the gate and the cap, so as to make the top of the cap the real height of the dam.

There is much conflict of evidence as to the fact of raising the mudsill in 1846. The defendant, by John Vandoren, the millwright who built the dam in 1827, and re-built it in 1846, by Peter H. Stryker, a carpenter who helped re-build the dam, and place and frame the sill and superstructure, and by John G. Crater, who was present, and, with Vandoren and Stryker, actually laid the sill in its place, gives direct evidence that it was not raised, but put in the position of the old sill. Defendant himself, who had owned the mill for twelve years, and known it for twenty years, and who was there from time to time while the dam was being re-built in 1846, testifies that it was not raised. They testify, further, that the first mudsill was kept in its place by rafters dove-tailed into notches on top of it, and extending for their full length of twenty-five feet up stream, with an inclination downwards, and which were covered with plank and gravel, so that they could not have been raised, and that the present sill was inserted under them, and that some stones below, which had to be removed for the purpose, were replaced by others put in to support the sill, but at no greater height.

On the other hand, for the complainants, J. R. Axtell, the mason who placed the stones under the sill, James H. Douglas, the tenant or miller who operated the mill at the time, his father, David A. Douglas, and his brother, Isaac P. Douglas, who were all present and saw the new sill placed, testify that it was put higher than the old sill by its own thickness of nine inches. The number of the witnesses is equal on

each side; their opportunity for knowing the facts is equal; and, for aught that appears, their credibility and intelligence are equal. The men who were operating the mill, and were to gain by raising the dam, would be as apt to notice and remember the fact of raising it, as the workmen whose interest in it ended with the day's labor. The rafters fixed in the earth are evidence of another kind. The memory of any one, as to the manner of doing what was of no particular interest to him, at the end of twenty years, is very unreliable. Few of us, when we revert to matters of a business nature, transacted, or witnessed by ourselves twenty years ago, can state particulars with confidence or accuracy, to our own satisfaction, without memoranda to rely on. But a fixed monument like these rafters which seem almost immovable, are entitled to reliance.

But the complainants adduce evidence by soundings, tending to show that these rafters are not twenty-five feet long, but only extend a few feet from the cap-piece, and that the planking extends only part of the way, and that beyond it the earth and loose stone, between and upon the rafters, would be no serious impediment, if the plank were removed, as they were in 1846, to raising each one separately, so as to admit the sill under it. The defendant was asked, but refused to let down the water, and permit the complainants to dig and see whether these rafters extended twenty or twenty-five feet from the sill, or so far as to be proof that the sill could not have been raised. The defendant was not bound to do this; he was not bound to furnish evidence for the complainants, nor should his refusal have any effect against him in the case except as to this evidence. But it must suggest great doubt as to the weight of that. Both parties have, without regard to trouble or expense, furnished evidence upon parts of the case far less important than this, and it would seem to raise a doubt as to the confidence of the defendant in this important testimony, that he was not willing, after the proof given by the complainants as to these rafters, to permit them, at their own expense, to show the

truth. It does not destroy the value of this evidence, but, in my mind, much weakens it.

There are again other matters to support the witnesses of the complainants. The theory of the complainants and their witnesses is, that the space between the first mudsill and cap-piece of 1827 and 1828, was about two and a half feet; that less than half of it was occupied by the permanent gates, and that the interval between the gates and the cap-piece was open, except where occupied by narrow, loose boards, which were occasionally put on; and that, where the mudsill was raised in 1846, this space was reduced to twenty-one inches. The defendant's theory is, that the mudsill and superstructure of 1827 and 1828, were, as to height, the same as now, and that the only alteration in height in 1846, was raising the cap-piece, by making the posts nine inches longer.

A number of witnesses for the complainants, who had opportunity of knowing, state that the distance between the old sill and cap-piece was from two and a half to three feet, and the opening above the gates from one to two feet. On the defendant's theory, the distance was then, as now, one foot, and the opening was not more than three inches. The difference between these is so great and obvious, that I can hardly conceive that any witness could make this mistake. Little reliance is to be placed upon the recollection or estimate of feet or inches by witnesses, but the impression made by an opening so narrow as three inches in a heavy superstructure like this, is so different from that presented by a space of one or two feet, that few would confound them. Yet this may seem possible, if we suppose that it is the recollection of the relative width of the opening to the whole space, which guides the witnesses; a mistake as to the whole space not seeming so absurd.

Again : if the raise made in 1846, was only to be of the cap-piece, which could be used or not, at the pleasure of Cooper, as he could arrange with T. M. Carlisle, it seems strange that he would not be willing to make that without

several messages to Carlisle, to find out if he could buy the right. He need have made no negotiation until 1852, when the raise seems for the first to have been effectually made. If the sill was to be raised, which, in high water would raise the level of the stream, and could not be lowered, there would be an object in making the bargain before doing the work.

These considerations leave great doubt as to the effect to be given to the evidence on this point, even as against the inference to be derived from the rafters. But, on the whole, especially as the presumption of fact would be that the sill was put in the same place, I yield my convictions to the force of the evidence of the defendant, and come to the conclusion the present sill is where that of 1827 was placed.

But, according to the principles of law above stated, which must guide us, it is not sufficient to show that the cap-piece of 1828 was elevated twelve inches above the sill so that the water *could* be raised to its top; but it must appear that it was used for that purpose, and that the water above it was raised to the height now contended as lawful, for twenty years continuously, or the prescription must fail. If the water, generally, was only raised to a point below the cap, or if for one or more years during the twenty years, the cap and gates were both away, and the water ran over the sill, the prescription cannot be maintained. If the gates were regularly raised in high water, it would not defeat the prescription; it would only qualify it, and give the right, subject to their being raised in high water. If, by accident or other cause, they were temporarily out of repair, and again replaced with usual promptness, showing the design to keep them up continuously, it would not defeat the prescription.

And, in this matter of proof of use, and the extent of use, so as to acquire the right, the burthen of proof is legally and properly on the defendant. He is seeking, without consideration of any kind, to appropriate property clearly belonging to another, and to acquire title by a law which was designed to quiet just title, and must, therefore, show him-

self within the provisions of that law. Courts should have no prejudice against statutes for limitation of actions. They are wise and beneficial laws, founded on principle, and without doubt more often protect than defeat right, and full effect should be given to their provisions. But the burthen of proof of title by possession against the former owner should be held strictly upon the claimant.

In this case, to show that he has right to raise the water to the top of this cap-piece, or for any distance above the sill, the defendant must show twenty years continued use to such height. The evidence need not be direct or positive; it may be circumstantial, or any kind of evidence that will convince the court.

The evidence on part of the defendant consists, and must consist, mainly, in direct proof that gates and boards were placed and kept up to a certain height over the sill; that, on part of the complainants, of proof as to the gates and boards, and, in part, as to the situation of the river and objects on the pond and river above the dam, tending to show that the dam could not have been kept at the height claimed.

Before the raising of the dam in 1846, which is an important period in the question, there is little evidence on part of the defendant, except as to the height of the top of the permanent gates. There is evidence as to loose boards, which may be called flush boards, sometimes put on by the tenants when the water was low, or in dry times, but there is no proof whatever as to the regularity or manner of their use, or that they were ever used, except when the water was low, and when their use would not raise the water at complainants' line higher than it might lawfully be. The measurements and observations of Stout Carey and others, clearly show that, by the use of these boards, the water at the dam might be raised to the top of the cap-piece from a foot below, and only raise the water in the stream above a fraction of an inch, although this was not generally the effect of the use of them. The only proof of the water being permanently raised above the regular gates first put in, is the

Z *

evidence of Vandoren, who made the gates, both in 1828 and in 1846, and who says that sometime after he made the gates, in 1828, of nine inches high, he saw that they had been made wider, so as to lap on the cap-piece, and made the water flow over it. This is so exactly like what is shown by several witnesses on both sides to have been done in 1852 or 1853, to the gates he put there in 1846, and is so entirely inconsistent with the testimony of a number of witnesses, who would more probably notice and recollect as to the gates of 1828, and whose evidence cannot be disregarded, that it is easy and natural to suppose that Vandoren has mistaken the time, and refers to the addition made to the gates of 1846. The additions were not made by him, but were only observed casually in passing the dam.

Vandoren says that the permanent or solid gates made by him in 1828, were nine inches wide; the defendant says they were nine or ten inches wide. Both say that flush boards were provided for the tenants to put on the gates when the water was low. Both knew that they were sometimes used. They give no particulars as to the use. The defendant, in his answer, where he was not confied to answering according to his knowledge, but could state the fact according to his information and belief, contents himself with saying, that since 1846 the water has been kept up so as to run over the tumble a *considerable* part of the time, and says nothing as to the water or gates on the old dam. And Crater says, that before 1846, he saw water run over cap-piece a *number of times*, but that the gates in old dam did not go up to cap-piece.

The new gates, after 1846, Stryker says, did not reach the cap-piece by three inches, and Vandoren says, he thinks were about seventeen inches wide, or about four inches below. This shows that, until 1852, there was no use, except by flush boards, that would reach within three or four inches of the top of present cap-piece.

Except to the height of the permanent gates of 1828 and 1846, respectively, the complainants fail to show any continued maintaining of the dam or the height of water above

the sill, or any continued use of flush-gates, or any regular intermitted use, by which a qualified right might be gained. On the other hand, the evidence of the persons who were tenants of the mill, and daily used the water and the dam, show that there was no such continued or regular use of anything, except the permanent gates. The evidence of the occupants of the mill from 1834 to 1863, with a short interval, is in the case.

David Woodruff, who occupied the mill from 1833 to 1839, testifies that in that time no loose boards or other contrivance, was used to raise the water higher than the gates, that the space between sill and cap was two and a half or three feet, and that the gate occupied twelve or fifteen inches of this space. On the assumption that he is mistaken as to space, and that his relative proportion only must be taken, the gates must be assumed as about seven inches high. Elias Dorland, who was employed by him frequently, during three years of this time, in the mill, says, there was nothing that he knew of to raise the water higher than the upper edge of the gates.

George D. Emmons, occupied the mill after Woodruff, from 1839 till 1843. He says, that he sometimes in dry times put boards on the gates, boards six inches wide, and these did not come within three inches of the cap. He says the gates, he thinks, were fifteen inches wide, which, with nine inches above them to cap, would make the space between sill and cap twenty-four inches at least. This is inconsistent with defendant's theory, which I adopted as to raising of the sill; taking his proportion as correct, the gates would be seven and a half inches high. He says, the boards were not on one fourth of the time, and for one whole season, were not on at all. He says, he did not use the fifteen inch gates much more than half the time; that the boards never closed the space up to the cap-piece; and he has no recollection of seeing the water up to the cap-piece. He thinks he did get the water to the top of these flush boards, but it was very seldom. He was called as a witness by the defendant.

Samuel D. Emmons, a brother of George, who worked for

him at the mill for two years, between 1839 and 1843, says, when he was there, the gates were held up by pins in the sill; that the frame work, that had been there at first on the top, had rotted away; that the gates were eight inches wide; and he recollects of nothing except these boards. ..

Simon V. Emmons, another brother of George, lived at the mill with him in 1840, and lived in the neighborhood in 1843 and 1844; he used to take the boards off the tumble-dam. He says they were between six and ten inches wide, and rested on the sill supported by pins; that there was no cap-piece there, but there was a piece across, two or three feet above the sill, to walk on.

Charles S. Emmons, a witness for the defendant, worked for George D. Emmons, at the mill, in 1839, for six months from the first of April. He says, boards were put on the gates in time of low water, but that they did not reach the cap-piece by four or six inches.

William Dorland, who worked at the mill for George D. Emmons, and used to raise and lower the gates, says that the cap-piece was about three feet above the sill, the gates from twelve to fourteen inches high, and came about two feet from bottom of cap-piece.

From 1843 to 1845, one Lanning occupied the mill, and there is no proof how the gates or flush boards were used in that time, or whether they were used at all. The presumption would be, that the gates were used, but as to the flush boards no use can be presumed.

From 1845 to 1850, Harvey Douglas occupied the mill. He says when he went there, there was no cap-piece; that the gates used were seven inches wide, and stood on the sill supported by pins; this was so until re-building in 1846; that the gates used on the sill after repairs in 1846 were not over eight inches wide; that he measured them; he never saw the water run over the cap-piece; it discharged under it. This witness was examined by the defendant in a former suit in this court, between the same parties. If he is to be believed, and no one contradicts him, there was no use of the dam or gates to a height more than eight inches above the

sill, from 1845 to 1850. Four of these five years are necessary to give effect to the prescription. And without proof that during these four years the water was kept more than these eight inches above the sill, the defendant cannot be adjudged to have any right above them.

Isaac P. Douglas, his brother, worked for him from 1845 to 1850, at the mill. He says, in 1845 the gates were supported on sill by pins in holes bored in sill, and that after new sill, in 1846 to 1850, the gates did not reach cap by nine inches.

John D. G. Carlilse supports the proof that, in Douglas' time, the gates were held by pins driven in the sill.

David A. Douglas succeeded his son Harvey, and occupied the mill from 1850 to 1852. He says the water never ran over the top of the cap while he was there; that the gates which Vandoren made did not reach the cap or fill the dam; that he made others a foot wide to do it; but these made by him were used very seldom.

William H. Dorland was tenant in 1852, and continued in the mill after that first year, until 1856. When he went there the permanent gates were on the dam, and flush boards were lying there. He thinks the permanent gates were fourteen inches, but never measured them, and has no reliable recollection about their width.

Abraham Emmons, who was in Dorland's employ at the mill from April 1st, 1852, for nine months, says that the gates then were eight inches high, and that he only once saw water run over the cap.

James Vanderveer occupied the mill in 1853. He says, before he came the water discharged under the cap; after that, over it.

About this time there was put in the mill two additional run of stones, and after this, the space of twenty-one inches to the cap was kept filled with flush gates which would raise the water to the top of the cap.

Whatever reliance ought to be placed upon the evidence on part of the complainants, even if we disbelieve all their

witnesses, yet there is nothing in the case to show that from 1846 to 1852, which is a vitally important point as to time, the efficient part of this dam was maintained continuously by permanent gates, or regularly, or with regular intermissions, by flush gates, or loose boards, more than nine inches above the sill. Vandoren swears, that he thinks the gates he made were about seventeen inches wide, and Stryker, that they reached within three or four inches of the cap; but there is no proof at all that these gates were continued in use from 1846 to 1853, and such evidence of their width, if their use was proved, would not be sufficient to establish title. And from 1842 to 1845, there is nothing to show that the gates were kept up higher, or in fact that they were kept up at all, and there can be no presumption that they were kept up higher than Douglas found them in 1845.

The defendant's title and its extent depends upon his enjoyment for twenty years, and there is no proof of enjoyment for twenty years, that extends to the top of the cap, as it now stands, and no sufficient or satisfactory proof that it extends beyond the top of the gates as they were in 1845 and 1846, before the raising of the dam. The width of these gates in 1845 and 1846, until November, is shown to have been between six and eight inches or seven inches—at all events not more; and from this evidence, I am compelled to determine that it was seven inches, which, with the thickness of the plank upon the sill, will make the height at which the defendant is entitled to keep the permanent gates in the dam, nine inches above the sill; this right is qualified by the obligation to raise them, in freshets or high water. There is no proof of any use of the flush boards or false gates in such definite manner, or at certain fixed times or occasions, as to have gained a qualified right to use them, when they raise the water to any extent at the land of the complainants. When the use of them does not so raise the water there, the defendant, of course, may place them on his gates. The post and cap-piece, as they now are, do not obstruct the flow of the water so as to affect the complainants' land, and will not

be interferred with; but the defendant will not be allowed in any way to diminish or close the space between the cappiece and the top of the gates, which must remain at least three and a quarter inches wide.

The conclusion at which I have arrived from the evidence, as to the use of the gates, is supported strongly by the facts shown as to the height of the trunk. The condition of the old trunk is inconsistent with the gates having been kept as high as the top of the present cap, but the height is not proved with sufficient certainty to show that the dam must have been lower than the point fixed above as the proper height. The old post is not sufficiently identified to be made the basis of an adjudication, and the proof as to the doorsill is so contradictory, and in itself so uncertain, that it could not be relied upon to fix the height by inches.

So, with regard to the bottom of the outlet, as deepened in 1837, and the state of the water when it was dug, as the bottom of it is eight inches lower than the present cap-piece, it is clear that, for the months occupied in digging, it could not have been kept clear from water or dug out at all, if the efficient part of the dam was of that height; but if the gates had been twelve inches lower, or nine inches above the present sill, when the water above the outlet was shut off, the water below would soon flow down into the pond, which was four inches below that level. There is nothing in this to vary or shake the conclusion at which I have arrived; but there is much to support it as against the defendant.

The complainants have introduced a mass of evidence as to the relative height of the water before 1846, and after it, at ten other localities in the pond, and along the river above the pond; and the defendant has produced evidence to rebut it. The weight of this evidence seems to me to be for the most part with the complainants, and I am convinced that it supports the conclusion at which I have arrived, as against the defendant. But this evidence is not of a nature to aid in fixing, within a few inches, the height at which the old dam stood, with the permanent gates in it, or to shake the

conclusion at which I have arrived, as to it. Much of it would show that the height of the dam should be lower. But it consists mainly of a kind of evidence that is not to be implicitly depended on. It is the recollection of the witnesses as to what was the general or usual height of the water in a stream or pond, in which that height varied very much and very often. It varied daily by the use of the water in the pond, and this variation was not regular, but, on some days, much greater than on others; it varied with the hour of the day, and the variation was not regular at the hour. And the change caused by rains, either showers or the usual continued rains in spring and autumn, was unusually great. Hence, at all these localities, a person who frequented them at one time or one season of the year, would adopt a different standard for the usual height of the water from one who usually went there at another time. And memory is very treacherous, after the lapse of twenty years, in fixing anything so vague and indeterminate as the *usual* height of water at an eel dam, a swimming rock, or a horizontal tree. It would be too tedious to review and collect the evidence upon these localities, but they are all disposed of in my judgment by the general considerations mentioned.