Butterfoss v. State.

John H. Butterfoss, appellant,

and

The State, ex rel. The Board of Health of the City of Lambertville, respondents.

The appellant was enjoined, at the suit of a local board of health, from discharging the refuse of his tomato-canning factory into a reservoir, thence into a covered sewer, and finally into a small natural stream, on the proof that such refuse was offensive in odor and "hazardous" to the public health.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

The defendant has an establishment in the city of Lambertville, in which he carries on the business of canning tomatoes, commencing about the middle of August, in each year, and continuing as long as the crop lasts. For ten years he has been thus employed. The process of canning requires the use of a good deal of water. This water, with all the tomato juice which escapes, together with the seeds and some of the skins, is discharged into a pool or reservoir, where it is retained until in the night, when it is again discharged into an open drain in Franklin street, along which it runs to a sewer, and through the sewer to Swan creek. These different parts so discharged have been called refuse. This pool or reservoir has a superficial area of about sixteen feet by twenty-seven feet, and is three feet deep. The open drain and sewer pass along and near to several dwellings, which have been and are occupied. Swan's creek is a small stream in summer, and especially in dry times, not over two feet in width and very shallow, its bed being earth, sand, gravel and stones, and its flow sluggish and very easily obstructed. On each side of this creek, and not far from its banks, are occupied dwelling-houses. The drain, the sewer and the creek are the receptacles not only of surface-water but of more or less decomposing matter, obnoxious to the sense and most likely deleterious

to the public health; at least, I shall, for the purposes of this case, proceed upon the belief that the compounds described contain and cast off vegetable poisons which, when generated or concentrated in sufficient quantities, as the common people say, produce disease—as the expert, perhaps, would say, invite disease. Farther than this I need not attempt to define its quality or to determine its quantity, for the bill is not filed against those who may be supposed to contribute thereto, although no small amount of testimony was admitted on the alleged theory that the board of health was wholly mistaken as to the real cause of complaint, the defendant insisting that it arose from the matter indicated, and not from said refuse, and that said refuse contributes nothing thereto.

The complaint is against the defendant for carrying on a business in a manner detrimental and hazardous to public health. During the "canning season" a great many have recognized offensive smells and odors, and they say that these smells and odors are sickening. Two questions arise: First, does the defendant materially contribute to them? Second, are they hazardous to the public health?

Whatever the true character of the odors may be, whether deleterious to health or not, the testimony is most overwhelming that they do not arise or are not observed until the canning season opens, and that they continue for some time after it closes. This is the testimony of witnesses of the highest respectability, who have observed the fact for several years. This much I cannot avoid believing, that the alleged offensive smells and odors arise during the canning season.

It is equally certain that the presence and flow of this refuse precipitates the odor, if it be not the only cause and source of it. The people who have lived beside this open gutter and covered sewer for years have had the most abundant chance to settle for themselves the question whether there was present any of the odor from tomatoes or not in the smells that so repeatedly arrested their attention. They all speak of it as the tomato smell. This is confirmed by all the witnesses. Thus far I am on most certain ground.

Butterfoss v. State.

But is this refuse, by its presence, in whole or in part, an element, an instrument or an agent in filling the air with noxious vapors? The testimony leads me to answer that it is. I understood Mr. Butterfoss to say that the vat or pool holds between three thousand and four thousand gallons, and that he discharged about one-third of this refuse daily. Thus it appears that two-thirds of the whole mass of refuse remain in the vat· or pool all of the time. This, it is insisted, greatly increases the objectionable features of the compound. It is urged that, in this condition, decay, decomposition and fermentation are in constant and rapid progress. Now, after the restraining order was served, Mr. Butterfoss did not discharge any of the contents of this reservoir for four days, and when he did so, after the four days, he describes it as " very offensive," and that it was so offensive is conceded. A great many so describe it in very strong terms. Well, then, if in four days the whole mass becomes very offensive, is it not beyond controversy that if two-thirds of the whole mass remain there all of the time, it will more or less contaminate, by commingling with the other and added one-third? That this will be so seems ·to me to be self-evident. The testimony of Mr. Butterfoss and of Mr. Dilly removes all hesitation to the belief that, however incontaminable tomato juice may be in itself, it did and does in this reservoir abide with a large quantity of most contaminating matter without such mat-, ter undergoing deteriorating changes, and that, however efficient it may act as a detergent or deodorizer in a given case, it cannot always prevent deterioration or contamination of a larger mass. In other words, the juice did not prevent decomposition or fermentation, or ·the very offensive smell. Hence, the' question is not suspended in theory, but supported by the very plainest fact. The incontestable fact is, that as thus compounded tomato juice will not preserve, however certainly it may cleanse. This mass, then, being susceptible of becoming " very offensive," and so becoming in the reservoir, what follows ? It is discharged into the open drain and sewer. The drain is a small ditch cut in the ground. The sewer is several feet deep, having in some portion of its length a stone bottom, with stone sides and flag covering.

These sewer walls are without mortar. After the refuse is discharged into this drain and sewer, there is also thrown into the sewer large quantities of hot water. This is done with the intent of cleaning the sewer of every vestige of the refuse. I am not satisfied that it does cleanse or expel all the refuse. I think that it is in every way reasonable to believe that the open ground and the crevices between the stones receive and retain large quantities of this refuse, not the skins or seeds, perhaps, but the liquid matter. This is demonstrated by the fact that this same "tomato smell" arises from the openings in the sewer for some time after the canning establishment closes.

But the defendant uses large quantities of water to float off all this refuse. This fact is very important. Why resort to this expense and expedient, if the complaint against him be not well founded? I believe that Mr. Butterfoss himself has been convinced that he has had and now has no right to discharge this refuse into that gutter and sewer, without doing something to prevent offence to his neighbors and fellow citizens. I believe that he was and is entirely sensible that it does and will, if unattended to, work hurt to others. This must be so, or he certainly would not adopt the means of purification and of cleansing which he has. However, notwithstanding the use of the water, I am persuaded that the soil where there is a stone bottom, as well as where there is not, becomes thoroughly saturated with and retains large quantities of this liquid refuse, and that, when the atmospheric conditions are favorable, greatly increases the offensive sewer gas so much feared and so injurious.

Two highly respected witnesses, both of them eminent as physicians, and one of them equally so as a chemist, whose judgments had great influence with the court, asserted that there is not, and cannot be, anything harmful or offensive about tomato juice. They both insisted that it is a preserver, a cleanser, a purifier, a deodorizer. In speaking of its cleansing properties, the chemist said that he applied some of this very liquid to the filthiest of filth, and that it was thoroughly cleansed and deodorized. He did not seem to doubt but that there was enough of the juice in this mass of refuse to keep the whole in a state of

purity.   But, as I have said above, I find that the fact contra-
dicts the theory.   Mr. Butterfoss contradicts the theory.   A large
number of witnesses corroborate Mr. Butterfoss.

But, if science establishes a principle, and, after all, the alleged
fact is only a temporary delusion, and the process towards preser-
vation is an offensive process, inasmuch as it releases the offensive
particles and casts them off and brings them distinctly to our
notice for the time being, the inquiry remains and cannot be
averted, Can the citizens, through the complainants, find relief
if the offensive process, by which the mass is preserved, casts off
an odor or nauseous smell injurious to public health ?   The two
witnesses last referred to think that the noxious odors come in
this manner : In the gutter, sewer and creek are considerable
quantities of earth and vegetable matter, the vegetable matter
undergoing a process of decomposition, but not so actively as to
cast off, in perceptible quantities, its dangerous gases, but retain-
ing those gases until the refuse, containing the tomato juice,
comes in contact with it, when they are liberated and float away
with the vapor throughout the surrounding atmosphere, leaving
the solid vegetable matter cleansed and free from the offensive
ingredient.

Now, if this be a full and satisfactory solution of the problem,
I do not understand that it changes the legal consequences.   The
noxious odors or gases are cast off and go about their work of
mischief.   This is effected by means of the cleansing qualities
of the acid tomato juice.   The foe to health was comparatively
chained or bound, or at least not escaping in perceptibly injurious
quantities, when the liberator comes along, or is sent forth by
Mr. Butterfoss.   In my humble judgment, Mr. Butterfoss is
responsible for this ; so to speak, he puts the match to the maga-
zine ; he unchains the tiger.

Taking it for granted that, as the two witnesses last named
think, there are these deposits of decaying vegetable matter in
the ditch, sewer and creek, for the presence of which others may
be responsible, there is no proof that the presence of this matter
in the places named, has ever been so seriously complained of as
to arrest the attention of the health officers of the city.   (I am

not referring to what has been said about the deposits in an open drain, in another place). Nor has it been shown, in this cause, that the sewers are allowed to become nuisances in the ordinary use of them. At and around the mouth of the sewer appears to be, or to have been, a quantity of most objectionable matter, so powerfully resisting that all this juicy refuse would not cleanse it; but what that abomination is—whether pure coal tar, vegetable matter without tomato refuse, or the tomato refuse in whole or in part—has not been settled before me. However, I think I need not labor with that filthy mass—certain it is that the juice fails to cleanse and purify it.

I conclude that the defendant is responsible for the smells or odors named in the bill, which are certainly so obnoxious to the sense of many citizens.

Finally, are the odors to be considered within the category contemplated by the statute? The board of health, it seems, has been empowered to " abate nuisances, sources of foulness or cause of sickness hazardous to the public health," and, instead of proceeding in a summary way, such board may file a bill in chancery, to determine the question, as has been done in this case. The counsel for defendant seemed to think that, taking the odors complained of at the worst, as described, they are not within the act. In his mind, the court must regard the word " hazardous " as synonymous with the highest or greatest extremity. I think he desired to lead my mind to the conclusion that the word was not used in a plain, simple or positive sense, but in a superlative sense. Reason and all rules of interpretation reject this argument. Manifestly, the law-making power did not intend to create a board of health with power to act only when and after they had watched the " source of foulness " from its beginnings and along its various grades of progression, until it has embraced the strong, debilitated the healthy and prostrated, the weak. Surely, the benefactors of our race do not thus display their philanthropy. No; it must mean simply danger, peril, risk.

Therefore, I come to the inquiry, Is this stench or odor hazardous to the public health? John C. Moore says that he ob-

Butterfoss *v.* State

served such a strong stench that he had to close his windows. Dr. Romine says that these smells are sometimes almost imperceptible, and sometimes almost unbearable. He, too, has been obliged to close his windows. He speaks of it being very bad in front of his dwelling. He has noticed the same stench or odor in several other places. He swears that it has influenced patients in that neighborhood. He never noticed it before the canning season, but has for at least four weeks thereafter. Dr. Lewis Rice, who has been practicing twenty-eight years—and all those years, with the exception of one, in Lambertville—says that, during the canning and until frost, they have been annoyed by these smells. The whole air is permeated, and it is especially bad at night and in the morning. It has greater effect at night, when the individual is asleep, because he then has less power to resist. His own family has complained. It affects their appetite. He has observed it very markedly, this year, himself. To him it is very nauseating. He has been obliged to sleep with his windows and doors closed, and could not use his parlor. He says that such gases are all non-supporters of animal life, and, in such quantities, must impair health. He, too, has noticed these gases or odors at other places in Lambertville than where he now resides. Dr. Oliphant has noticed them in several different places, and, at least, two squares distant from the sewers. He declares that the smell is very offensive to the sense, and very injurious to the health. He says the effect is similar to the effect of the dissecting-room. He has no doubt but that it is dangerous to public health—has a tendency to aggravate all intestine troubles, and the class of fevers called intermittent. To him it has appeared very offensive since the pendency of this suit. Dr. Wetherill has noticed these smells for several years during the canning season. During hot weather it is very bad. On the 18th of September, when the reservoir was emptied, after standing full for four days, he says it was not to be borne at his house—it was intolerable. He does not notice it before the canning season, but does for some time afterwards. He has no doubt about the source of this odor. He, too, says it is injurious to public health. T. R. Hunt speaks of the smell from the sewer as very offensive dur-

ing the canning season, as do Mrs. Twomey and her daughter, both of whom have been made sick by it, the latter, this year. It became so offensive in Mr. Field's house as to awaken him at night, and his daughter says it was very offensive. E. R. Solliday was mayor six or seven years ago. There were many complaints made to him then of this odor. He remonstrated with Mr. Butterfoss. He has noticed the smell at his dwelling, and it produces discomfort. W. H. Davis says that on the 25th of September last the odor was fearful, so bad that he was obliged to close his doors, and it made him sick at his stomach. Job S. Sebold says it made him sick twice in September. A number of witnesses were called in corroboration of what already appears.

The facts here disclosed, I think, warrant the filing of the bill. The defendant offered a great many witnesses, but the positive and affirmative declarations above presented remain untouched. I can discover no ground for impugning the motive of a single witness on either side. There seems to be nothing to provoke any interest or bias, except the interest which every right-minded man has in the happiness and welfare of his fellow men ; surely these physicians can be trusted. If bias or selfishness could animate, them they would not have been on the side of the complainants. I believe them to be as honest as I have every reason to believe the two called by the defendant are.

And believing this, the testimony is very convincing that the use of the vat, pool or reservoir as now used, and the gutter and sewer and the creek named in the bill, is a source of foulness hazardous to the public health.

I will advise a decree to this extent in accordance with the prayer of the bill. The complainants are entitled to costs.

*Mr. R. S. Kuhl,* for appellants.

*Mr. C. A. Skillman,* for respondents.

PER CURIAM.

This decree unanimously affirmed for the reasons given by the vice-chancellor.