By section 28 of an act entitled "An act to establish in this state, boards of health and a bureau of vital statistics and to define their powers and duties," as amended and supplemented (Comp. Stat. p. 2668), the legislature declared and enacted "that any such local board of health, instead of proceeding in a summary way to abate a nuisance hazardous to the public health, may file a bill in the court of chancery, in the name of the state, on the relation of such board of health, for an injunction to prohibit the continuance of such nuisance, and such actions shall proceed in the court of chancery according to the rules and practice in such cases on the relation of individuals, c." *Page 6 
Proceeding under and by virtue of that statute the state, on the relation of the board of health of the township of Lyndhurst, filed a bill for an injunction to prohibit the United Cork Companies from maintaining and continuing what it claims to be a public nuisance, hazardous to the public health. The gravamen of its complaint is that this defendant permits deleterious cork dust, odors, fumes and gases to escape from the confines of its plant, wherein such are created and disseminated, which pollute the outside atmosphere to such a degree as to render it hazardous to the health of those residing within the contaminated area.
The defendant, a New York corporation, as its name indicates, is engaged in the business of manufacturing cork flooring and other products of which cork is a principal ingredient or component part. After having been located in Hoboken for about three years, it moved its establishment to Lyndhurst, where it has been operating ever since June, 1911. Apace with its business development and policy of expansion, it kept enlarging and extending its operations, equipment and plant. Tracts of land adjacent and contiguous to its original site were acquired upon which it, from time to time, built and erected what has here been described as the office, bake oven, grinding, sifting, cork, storage, warehouse and engine buildings, which constitute its present plant and establishment.
In the course of its business, defendant consumes large quantities of raw cork, which it stores upon its premises in five large one-story frame buildings, called "storage sheds." From there, as the business requires, the raw cork is transported to the "grinding building," a one-story brick structure forty feet in width by sixty feet in depth, wherein from forty to fifty tons of cork a day are ground into small particles. This ground cork is then conveyed into the "sifter building," a two-story brick structure, forty feet in width by sixty feet in depth, wherein it is sieved, and after which it is processed and brought into the "oven buildings," two one-story brick structures, each sixty feet in width by two hundred and forty-five feet in depth, wherein it is baked into cork boards. *Page 7 
The "grinding building" and "sifter building" are each ventilated by means of vents and louvers, which, of necessity, provide an avenue for the escape of the cork dust, created and disseminated in each of these buildings, into the outside atmosphere. The monitors and apertures in the vents and louvers in each of the "oven buildings" are always kept open in order to facilitate the necessary ventilation of each of those buildings. A smoke stack, one hundred and seventeen feet tall, is erected on the northerly and southerly end of each of those buildings. Each of these smoke stacks is connected to a flue to which is connected a hood, having a base measurement of ten feet in width by fifty feet in length, which is erected over the northerly and southerly ends of the bake ovens installed in each of those buildings. It is through these hoods, flues, stacks, vents and louvers that large and incalculable quantities of odors, fumes and gases, generated and liberated by the cork being baked in these ovens at a temperature of six hundred degrees Fahrenheit or more, ascend, are emitted and dispersed into the outside atmosphere. The process of baking is continued, day and night, from Monday to Saturday noon of each week.
Not more than three hundred feet to the north of defendant's establishment are located Second and Third avenues, which are intersected by Delaware, Livingston, Stuyvesant and Lake avenues, respectively. Second and Third avenues extend for a considerable distance both to the east and west of defendant's plant, are of a residential character, well kept and built up with substantial and fairly expensive private dwellings, which are principally occupied by their owners, all respectable citizens of that community.
These residents, occupants and property owners, together with others, bitterly complain of the cork dust, obnoxious odors, fumes and gases which emanate from defendant's plant, settle down upon their respective persons and property and pollute the atmosphere with such intensity that they are deprived of the ordinary enjoyment and comforts of their respective homes besides being subjected to such physical distress as tends to impair their health. *Page 8 
In substantiation of these complaints, relator, during the fifteen days required for the trial of this case, produced numerous witnesses, the great number of whom renders it impracticable to here summarize the testimony of each. However, a careful consideration of the testimony of each discloses that all uniformly testified to the existence of the distressing conditions here sought to be enjoined, which they said emanated from defendant's plant, invaded their homes and contaminated the atmosphere in which they had to live and breathe. With the utmost sincerity and candor, and in unmistakable language, each of them described the physical distress and discomforts which those conditions produced and forced them to endure.
Succinctly summarized, their testimony is that they were harassed and distressed by the odors, fumes, gases and dust emitted from defendant's plant, which pervaded and defiled the atmosphere to such an extent that some were seized with coughing, gasping, gagging or choking sensations; others with nasuea and still others with vomiting spells. Some experienced a burning or irritating sensation in the eyes, nose, throat or respiratory organs, while not a few were often forced to leave their meals. Most of them had to keep their doors and windows closed, even on the hottest and most sultry summer days, especially when the breezes were from the south of the defendant's plant. A number of them were disturbed and aroused from their sleep by the invasion of these odors and fumes, and constrained to close their windows and keep them closed. Some were made uncomfortable while sitting in their own homes or on their piazzas in the summer time; others were often forced to rinse and even completely redo their family wash in order to free it of the cork dust which had adhered to and the burnt cork odors, gases and fumes which had permeated it while drying on the clothesline.
This testimony was abundantly supplemented and substantiated by that of numerous physicians, chemists and experts on atmospheric pollution. Mr. MacGarry, a health inspector of Lyndhurst, testified that the different conditions and the nuisance complained of actually existed, especially in and *Page 9 
around the vicinity of the defendant's plant. Dr. Willis, a resident and practicing physician of Lyndhurst, testified that when on professional calls in that neighborhood, the pervading odor of burnt cork irritated his nostrils and that, especially on damp or sultry days, he often observed a hanging haze in the atmosphere, which, in his opinion, was prone to be injurious to the health of those within its range. That the habitual inhalation of the fumes and odors emitted by the defendant's plant would render one susceptible to any pulmonary or throat condition, eventually producing in such persons conditions similar to anthracosis or silicosis, was an opinion also expressed by that witness.
Dr. Andrew F. McBride, a physician of unquestionable repute and ability, a recognized authority on public health, and a former commissioner of labor of this state, testified that he was familiar with the constituent properties of cork, as well as with their effect upon the human health, and that, in his opinion, the odors, gases, fumes and cork dust, and their effects were detrimental and pernicious to the health of those exposed thereto, because of their tendency to lower the bodily resistance, incidentally rendering such persons more readily susceptible to disease, and hence, in his words, constituted "a peril to the health of the community and a risk to the health of the community."
The health officer of Lyndhurst, Dr. McDede, said that he often noticed that the atmosphere in the neighborhood of the defendant's plant was laden with smoke and dust, which, when inhaled, would give him "a mechanical catarrh," and that, in his opinion, this atmospheric condition, because of its tendency to lower the bodily resistance, was injurious to health. The opinion was expressed by Dr. Moshier, also a practicing physician, that the various symptoms and effects described by the different witnesses, if of sufficient frequency, would be injurious to their health, because their irritating effect upon the nasal, throat and bronchial mucous membranes would eventually result in a lowered resistance of such organs. To this may be added the testimony of Dr. Paul Liva, who too said that the conditions described by the various *Page 10 
witnesses had a tendency to lower their bodily resistance to disease, and that an odor, which is sufficiently pungent to arouse one from his sleep, is a risk and hazard to that person's health.
Defendant called as one of its witnesses Dr. Henry H. Kessler, who, upon being interrogated with respect to the effect of the odors, fumes and gases generated by baking cork, admitted that "there is a possibility it would cause anemia" and that the systemic absorption of an irritant to the respiratory tract would be harmful to health. It was also admitted by this witness that the defendant's plant, if it were not cleared of the cork dust and fumes which were engendered and diffused therein, would be a hazardous place to be and work in.
Another of defendant's witnesses was Dr. Arcangelo Liva, who also admitted, on cross-examination, that the cork odor which emanated from the defendant's plant was offensive and that it was injurious to health to inhale a fume or odor which would cause nausea, because of its likelihood to lower the bodily resistance to disease. He also conceded that the fumes and odors discharged from defendant's plant, if of sufficient intensity to constrain persons living in that vicinity to sleep with their windows closed, would be detrimental to the health of such individuals.
Dr. Howard N. Cooper, also defendant's witness, conceded that, when in the vicinity of Second avenue, he often observed a haze in the atmosphere which, on humid or damp days, was obnoxious. This witness also admitted that, if the intensity of the pervading odors was such as to constrain persons to close their windows at night, they would constitute a menace to health. Dr. Grady, who also testified for the defendant, acknowledged that the inhalation of cork dust is perilous to the health of the person so doing.
All of the foregoing testimony was scientifically explained, supplemented and enlarged upon by that of chemists, engineers and experts on atmospheric pollution. Morton I. Dorfan, a mechanical engineer with considerable experience on dust, fumes and nuisances engendered by industrial operations, *Page 11 
testified that he, at relator's request, made a thorough study and examination of defendant's plant and equipment for the purpose of devising ways and means of obviating or eliminating the conditions here sought to be enjoined; that he found that the conditions complained of actually existed, and that they originated in and issued from defendant's plant, which findings, together with his recommendations as to the manner of extirpating the nuisance thus created, he embodied in a comprehensive report which he prepared for and submitted to relator. A copy of that report was gratuitiously, and in a spirit of kindly co-operation, furnished by relator to defendant, who, in acknowledging its receipt, wrote the former, "we believe that several of the recommendations made by Mr. Dorfan as to the so-called smoke are meritorious. In fact, we have already made a few installations such as Mr. Dorfan has recommended and are willing to try out others."
Mr. Hand, employed by the federal government as one of its experts and advisers on atmospheric pollution and an author and co-author of several pamphlets issued by the federal government on that subject, testified that he had collected several samples of dust and atmosphere in and around the vicinity of defendant's plant for testing and analytical purposes, and that these tests and analysis conclusively established, and the microphotographs clearly disclosed, the presence of cork.
Mr. Smith, a chemist associated with the Edel Laboratory, testified that he collected samples of dust and atmosphere in the vicinity of defendant's plant as far back as 1923, the tests and analysis of which disclosed, besides cork, the presence of suberin — a waxy substance volatilized by cork while undergoing baking — which mixes, condenses and solidifies itself in the air into which it is discharged. The state board of health, upon analysis also found cork in the sputum specimens of several of the complaining residents. The atmospheric tests made by Mr. Handy, defendant's own chemist, likewise disclosed, as was admitted by him, the presence of cork.
A consideration of all of the evidence impels me to the irresistible and inescapable conclusion that the cork dust *Page 12 
and the deleterious odors, fumes and gases here complained of, did, when the bill was filed, and still do, emanate from defendant's establishment, and then were, and still are, hazardous to the public health.
It is no answer to relator's evidence clearly establishing the existence of the public health hazard that some of defendant's employes and other of its witnesses testified that they were not annoyed or distressed by these odors, fumes, gases or cork dust, none of which they said was even unpleasant or disagreeable to them. To hold otherwise would be to completely overlook and ignore the well established rule that the charge of a nuisance, predicated upon conditions offensive to persons in general, cannot be successfully met nor overcome by merely showing that to some persons such things are not at all offensive, disagreeable or unpleasant. Kroecker v. Camden Coke Co., 82 N.J. Eq. 373;State, ex rel. Board of Health of Irvington v. Schmidt, 83 N.J. Eq. 35; Peragallo v. Luner, 98 N.J. Eq. 726. And so inCleveland v. Citizens Gas Light Co., 20 N.J. Eq. 201, this court, in referring to a nuisance, said it "is not the less so because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort." The principle there enunciated has received unqualified recognition and application in a myriad of well considered cases in this and other states, amongst which are: Ross v. Butler,19 N.J. Eq. 294; Seligman v. Victory Talking Machine Co.,71 N.J. Eq. 697; affirmed, 72 N.J. Eq. 946; Laird v. AtlanticCoast Sanitary Co., 73 N.J. Eq. 49, and Rausch v. Glazer,74 Atl. Rep. 30.
In the absence of proof, as is the fact here, that the complaining residents are fastidious or possessed of any idiosyncrasies rendering them more apt to be affected in the manner described by them, the presumption is that they are possessed of a normal conditioned body and mind (State, ex rel.Board of Health of the Township of North Brunswick v. Lederer,32 N.J. Eq. 675), a presumption which has here, by the very appearances and demeanors of these witnesses upon the stand, been demonstrated to be an actual fact. *Page 13 
Nor is there any legal merit to the insistment that the public nuisance here assailed is not "hazardous to the public health" and, therefore, neither cognizable nor enjoinable in this statutory proceeding, since no one has been shown to have actually become afflicted with disease as a result thereof. The fallacy of this contention is in the fact that it would make the statutory operation dependent upon the existence of actual injury instead of mere hazard. Conservation of the public health, through the eradication and prevention of conditions hazardous thereto, is the benign theme and animating motive of this health statute. The creation and continuance of conditions which, if not arrested, would ordinarily tend to the production or promotion of disease is the mischief which it was designed and intended to avert. Whenever, as here, a hazard to the public health looms up and is shown to exist, the mischief at which the statute is aimed has appeared and the application of the remedy therein prescribed is called for. State, ex rel. Board of Health of Irvington v.Schmidt, supra; Damadio v. Levinsohn, 111 N.J. Eq. 84.
In construing this statute, the late Vice-Chancellor Bird, inState, ex rel. Board of Health of Hamilton Township v. Neidt,19 Atl. Rep. 318, significantly said: "It seems to me that the intention was to submit to the board of health, and to the court of chancery, the power of determining in every such case whether or not every such nuisance may, in any reasonable event, tend to the inviting, generating, fostering or promoting of disease. This must be so, since the question is not whether there is a nuisance or not, for the whole argument is predicated upon the fact that a nuisance exists. Therefore, the whole inquiry is, is there any hazard, damage or peril to the public health from its presence?" Of similar effect is the pronouncement of this same eminent jurist in Butterfoss v. State, ex rel. Board of Health of theCity of Lambertville, unanimously affirmed on appeal in 40 N.J. Eq. 325,
"manifestly the law making power did not intend to create a board of health with power to act only when and after they had watched the `source of foulness' from its beginnings and along the various grades or progression, until *Page 14 
it has embraced the strong, debilitated the healthy and prostrated the weak."
Escape from accountability for the public health hazard thus created and continued by the operation of its plant is here sought by defendant upon its claim that other industries in that locality add or contribute to the noxious conditions there existing. Such contention, however, loses all vitality where, as here, the evidence is incontestable that, quite independent of any dusts or odors emitted by other industries, it was the odors, fumes and gases of burnt cork and the dust thereof — which unquestionably emanated from defendant's plant alone — that rendered, and still render, the complaining residents uncomfortable and distressed at their meals, during their sleep and while in and outside of their respective homes. It cannot be gainsaid that the operation of defendant's plant created and produced entirely new hazardous conditions in that particular neighborhood with respect to the health, comfort, and very existence of the residents thereof, by reason of which, aside from those already mentioned, complainant is entitled to, and should be granted, the relief which it here seeks. Kroecker v.Camden Coke Co., supra, and cases therein cited.
The fact that it has carried on its business in that locality for upward of twenty years is invoked and urged as a reason for refusing the relief prayed for, and this notwithstanding the attending hazard to the public health. The rule, however, is now well settled that a right to maintain a nuisance, as against the public, cannot be acquired by prescription. Cross v. TheMayor, c., of Morristown, 18 N.J. Eq. 305; Tainter v. Mayor ofMorristown, 19 N.J. Eq. 46; State, ex rel. Board of Health ofTownship of North Brunswick v. Lederer, supra; Trenton andMercer County Traction Corp. v. Inhabitants of Ewing Township,90 N.J. Eq. 560. Neither can the extent of defendant's represented investment nor the fact that some of those complaining had, after defendant's advent, voluntarily established their homes in that particular neighborhood (Fertilizing Co. v. Hyde Park, 97 U.S. 668; 24 L.Ed. 1036) excuse the relator from a full and conscientious *Page 15 
performance of the duty which the statute has here enjoined upon it, nor should either of such facts deter or stay the hand of this court, upon being fully satisfied of the existence of conditions shown to be hazardous to the public health, from lending its aid and assistance, when properly enlisted, to the duly constituted health authorities in enabling them to effectively and expeditiously discharge their said statutory duties and obligations to the public at large. In such a situation, the eradication of disease breeding or conducing sources and their supplantation by salubrious conditions and environments — under which healthy children may be borne, healthy men and women reared, and incidentally the health of the citizenry, with which the state and nation must do its work in the years to come, conserved — is indeed a matter of far greater moment and concern to this court, the state and nation at large.
It is further earnestly insisted that, since defendant has already, from time to time and during the pendency of this suit, introduced various devices, contrivances and improvements, resulting in a partial abatement of the conditions here complained of, injunctive relief against it ought not to be now granted. Notwithstanding this partial abatement, the evidence is most convincing that the existing conditions still continue to be hazardous to the public health. Nor is the rule here to be overlooked that the partial abatement of a nuisance pending the suit cannot defeat the right of the aggrieved party to the complete relief which he may have been entitled to at the time of the institution of his action. Carlisle v. Cooper, 21 N.J. Eq. 576; affirmed, 19 N.J. Eq. 256; Kroecker v. Camden Coke Co.,supra; Great Council of Improved Order of Red Men of State of NewJersey v. Mohican Tribe No. 64, c., 114 Atl. Rep. 440.
The proverbial patience of Job, plus an almost unlimited amount of consideration, was manifested by relator in its diligent and peaceable efforts to have defendant amicably eliminate the hazardous conditions here testified to. From as far back as 1920, and right up until June 12th, 1923, when it was constrained to file its bill of complaint, relator, *Page 16 
as the undisputed evidence shows, asked, implored and even importuned defendant towards that end, but all without avail. At considerable trouble and expense to itself, it caused examinations, tests and surveys to be made of defendant's plant and equipment, as well as of the atmospheric adulterations produced by the operation thereof, for the purpose of devising ways and means, if possible, of eliminating the existing noxious conditions.
The fruit and results of all these efforts and researches, as well as the resulting suggestions and recommendations, were all submitted and made available by relator to defendant, and this without a single cent of cost to the latter. Upon defendant's repeated promises and assurances to eradicate the health hazardous conditions, relator kept postponing the final hearing on its present bill up until 1929, when, as a result of defendant's apparent indifference, it was constrained to proceed. It was only after relator had exhausted all the peaceable methods at its command, that it was compelled to resort to, and prosecute to a finality, these proceedings, in order to force defendant to eliminate those conditions which it then was, and still is, under a legal duty to do, but has as yet failed to do.
Relator is entitled to injunctive relief in accordance with its bill, and it will be so decreed.