JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON,
EDMUND B. LEAMING, JAMES E. HOWELL, VIVIAN M.
LEWIS, JOHN H. BACKES AND JOHN GRIFFIN,
VICE-CHANCELLORS.

GEORGE P. KROECKER et al.

*v.*

THE CAMDEN COKE COMPANY.

[Decided October 31st, 1913.]

1. Any business, however lawful, which causes annoyance that materially interferes with the ordinary comfort, physically, of human existence is a nuisance that should be restrained.

373

2. The operation of a coke manufacturing plant in such manner that smoke is almost incessantly emitted from one or more of the ovens, day and night, and clouds of dust are created by the unceasing activity of a steam bucket dipping up and dumping down soft coal and coke, both day and night, materially interferes with the comfort of human existence in the neighborhood, and is a nuisance as to owners or occupiers of property in the neighborhood.

3. The operation of a coke manufacturing plant in such manner as to emit fumes and vapors which, under certain conditions of the atmosphere, caused such an unpleasant odor that those residing in the neighborhood felt constrained to keep their windows closed is a nuisance, and should be enjoined at the instance of owners or occupiers of property in the neighborhood.

4. Where a bill to enjoin a nuisance alleged that loud and disturbing noises were caused by the operation of a particular machine, but it also contained a prayer for general relief, and the proof for both parties covered all noises caused by the operation of defendant's plant, they would all be given consideration.

5. Temporary inconvenience from noises caused by an occupier or owner of land in the execution of lawful works in the ordinary use of the land is not ground for an injunction.

6. The operation of a coke manufacturing plant in such manner as to cause noises day and night, which disturbed and deprived those living in the neighborhood of their sleep, was a nuisance, and the manufacturer would be enjoined from so operating his plant during the night time.

7. Things offensive to persons generally are a nuisance, although not unpleasant or disagreeable to some persons because of their habits and occupations.

8. The right to relief against a private nuisance cannot be defeated by partially abating the nuisance pending a suit for relief.

9. Parties entitled to an injunction against a nuisance will not be left to their remedy at law for damages.

---

On final hearing on pleadings and proofs.

*Mr. John L. Semple,* for the complainants.

*Mr. Edward A. Armstrong,* for the defendant.

WALKER, CHANCELLOR.

This is a bill filed by George P. Kroecker and George W. Tucker, of the city of Camden, as complainants, on behalf of themselves and numerous other residents and property owners of said city, among whom are those whose affidavits are annexed to the

bill, to enjoin the defendant, the Camden Coke Company, from operating its works in said city in such a manner as to produce smoke, cinders, gases, soot, dirt, tar, odors and vapors offensive and injurious to the health and comfort of the complainants and their families, and to the depreciation of their real estate.

The complainant George P. Kroecker, before and at the time of the committing of the grievances in the bill mentioned was, and still is, the owner and occupier of a hotel and saloon with a dwelling-house attached, on the easterly side of Front street, in the city of Camden, where he carried on the business of a hotel and saloon keeper. He was also the owner of several other dwelling-houses in the same immediate neighborhood. The complainant George W. Tucker, and the other complainants, were also then owners or occupiers of houses and lands in the same immediate neighborhood. The defendant, the Camden Coke Company, was incorporated for the purpose of carrying on the business of the manufacturing and selling of coke, made from bituminous coal, by the Otto-Hoffman coke oven process, or otherwise, and the sale of all other by-products thereof, such as tar, ammonia and gas, and then carried on the business at a manufactory in a more or less densely peopled section of the city, situate on the westerly side of Front street, directly opposite the premises of the complainant George P. Kroecker, on a tract of land owned by the defendant, abutting on Front street, bounded by the Delaware river, Walnut street, Front street and the property of the Atlantic City Railroad Company, comprising an area of upwards of a city block.

The main issues raised by the pleadings are:

Whether or not before, and at the time of the filing of the bill, the defendant caused to issue and proceed from its manufacturing plant offensive, noxious, unwholesome smoke, cinders, gases, soot, dirt, tar, odors and vapors, which spread and diffused themselves into, over and upon the complainants' premises, houses, places of business and lands, and impregnated and corrupted the air in and about the same, and settled and were deposited in and upon the said premises, respectively; and caused such loud noises to issue and proceed therefrom as to destroy their sleep.

The plant of the defendant company is used for the making of foundry and domestic coke, and gas for the supply of Camden and thirty-three other muncipalities named in the answer, scattered over a considerable portion of this state extending as far south as Woodbury, and as far north as Plainfield and Raritan, and also in manufacturing and selling the by-products mentioned.

The plant at first consisted of one hundred, but afterwards was increased to one hundred and fifty, Otto-Hoffman by-product coke ovens, the roofs of which are on a level with the second stories of the surrounding houses, together with the necessary apparatus for charging the ovens with coal, and discharging them, consisting of three machines commonly called "pushers," and three machines commonly called "larries" for carrying the coal; also in conjunction with these ovens there is a coal storage bin, called a Berquist coal bunker, of a capacity of fifteen hundred tons, with the necessary coal handling apparatus for delivering the coal into the bunker either from the boats which bring it, or from the ground, as the case may be; and the bunker is provided with a crusher for crushing the lumps of coal and coke.

The coal when brought to the plant is unloaded from the boats by means of what is known as the clam-automatic bucket, having a capacity of a ton and a half, which drops into the boat, takes the coal up automatically, and hoists it up and delivers it into the bunker or on to a coal storage pile near the river, and is operated by steam power; and in the same manner the coal is loaded from the storage pile into the bunker and unloaded into the larries when required for the ovens; and likewise in the same manner the coke is loaded into the bunker and discharged therefrom on the coke storage pile bordering on Front street.

The method of operating the ovens is as follows:

The coal is taken from the coal bunker into a larry, being a mechanical carrier, and is transported over the tops of the ovens to the ovens which it is desired to charge. Each of these ovens is fitted with six caps or charging holes, and there are six corresponding outlets in the larry; the larry being brought over the oven to be charged, the caps are removed and the coal is dis-

charged into the oven by means of the operator on the larry raising a lever opening all six shoots at one time. The average charge of these ovens is about seven and three-tenths tons of coal. As soon as the coal is charged into the oven a mechanical leveling machine is operated from the side to level the coal in the oven.

During the time these caps are removed and the oven is being charged and leveled, some of the resulting gas, of necessity, is dissipated in the air.

The coal, when once placed in these ovens, is kept there for at least twenty-four hours, and during all that time no gas can escape into the atmosphere. The process of charging and leveling an oven consumes, on an average, about five minutes, but it is not done in each oven oftener than once in twenty-four hours.

In the manufacture of such gas at this plant there is used, on an average, about nine hundred tons of bituminous coal each day, and the plant is in continuous operation, day and night, every day in the year.

Upon the plant there is stored considerable bituminous coal in greater or less quantities, but at no time exceeding more than fourteen days' supply, which would be about twelve thousand six hunderd tons.

This coke plant was started in operation in the year of 1903 and has been in continuous operation ever since.

The courts of this state have frequently exercised their restraining power against persons so using their property as unreasonably to interfere with the property and personal·rights of others, so that the principles of law and equity which must govern this case have been fully considered and are well settled.

In the case of *Cleveland* v. *Citizens Gas Light Co., 20 N. J. Eq. (5 C. E. Gr.) 201,* a suit for injunction to restrain the defendants from erecting or carrying on their gas works, Chancellor Zabriskie (on *p. 205*) declared the principle to be that:

"Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained; and smoke, noise, and bad odors, even when not injurious to health, may render a dwelling so uncomfortable as to drive from it

any one not compelled by poverty to remain.    Unpleasant odors, from the very constitution of our nature, render us uncomfortable, and when continued or repeated, make life uncomfortable. To live comfortably is the chief and most reasonable object of men in acquiring property as the means of attaining it; and any interference with our neighbor in the comfortable enjoyment of life is a wrong which the law will redress.    The only question is what amounts to that discomfort from which the law will protect."

And in describing the criterion for determining whether or not a particular use of property is a nuisance, he further said:

"The discomforts must be physical, not such as depend upon taste or imagination.    But whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so, because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort.    Other persons or classes of persons whose senses have not been so hardened, and who, by their education and habits of life, retain the sensitiveness of their natural organization, are entitled to enjoy life in comfort as they are constituted.    The law knows no distinction of classes, and will protect any citizen or class of citizens, from wrongs and grievances that might perhaps be borne by others without suffering or much inconvenience.    *    *    *    This, then, is the question before me: whether the proposed works of the defendants would produce such annoyance as would render such families, ·composed of women and children, as well as men, uncomfortable; not whether men accustomed to follow their occupations in places where they are surrounded, and unavoidably, by much that is offensive, may not be so accustomed to odors of like nature as not to be annoyed by these."

In *Laird* v. *Atlantic Coast Sanitary Co., 73 N. J. Eq. (3 Buch.) 49,* which was a bill by complainants, as residents and owners of property, to abate or enjoin a nuisance created by noxious odors alleged to be diffused through the air, partly by means of smoke, and partly in the ordinary mode, it was held that the operation of a crematory and fertilizer plant, in which ordinary garbage and other waste matter was subjected to a

burning process, and the residue, in the shape of ashes, used in connection with other elements to make a fertilizer, in such a manner that, under certain conditions of the atmosphere and direction of the wind, the smoke arising from the cremation, and odor due to the method of handling the elements of the fertilizer, compelled those residing within a distance of from two thousand to two thousand five hundred feet to keep their windows closed, and rendered their houses uncomfortable for habitation, and prevented them from sitting out of doors, constituted a nuisance.

In this last-mentioned suit, in considering the criterion for determining whether or not the particular use of the property was a nuisance, Advisory Master Pitney said (at *p. 52*) :

"With regard to the character for offensiveness and the intensity of the odor. The complainants and their families are not over sensitive people, but plain, ever-day folk, and their evidence must be considered accordingly. Their evidence was that in the conditions of the atmosphere and the direction of the wind, which I have mentioned, and especially, and mainly in warm weather, the odor was very unpleasant, so much so that they felt constrained to close their windows and keep them closed. They were rendered uncomfortable, both at their meals and when sitting in their houses and on their piazzas, in the summer time. This situation of things is serious. They have the right to have the air come to them in a state of ordinary purity, so that they can comfortably enjoy, during the hot months, the ordinary currents of air. In all these cases it is a question of degree. In this case the evidence satisfies me that the degree of intensity was such that ordinary, plain people would be rendered uncomfortable by it."

In *Seligman* v. *Victor Talking Machine Co., 71 N. J. Eq. (1 Buch.) 697; affirmed in 72 N. J. Eq. (2 Buch.) 946,* which was a suit to abate a nuisance created by disturbing noises and vibrations, where the plant of the defendant company and complainant's dwelling-houses were each in the same block of land in the city of Camden, it appeared that by reason of a new method of distributing to its customers the records used in the talking machines, the defendant was compelled at certain times

to operate its machinery continuously from six o'clock in the morning until a late hour at night, and finally, until four o'clock in the morning. It was the noise and vibrations from this machinery of which complaint was made. The vibrations were shown to be of about the same character and intensity as those occasioned in the same building by the passage of trolley cars or of heavily-loaded trucks, the only difference being that those occasioned by the machinery were continuous. There Vice-Chancellor Garrison (at *p. 699*) said:

"I am satisfied from the proofs that, so far as making of noise or the causing of vibrations are concerned, the machinery in this factory is properly installed and carefully operated and does not cause any more noise and vibrations than usually accompany or are incident to the operation of any considerable amount of machinery using steam. In other words, I think that the situation is that of an ordinary manufacturing plant producing the ordinary noises of such an establishment, and if it were operated only during the hours of the day when such plants are customarily operated, it would not be subject to restraint upon the proofs in this suit."

The vice-chancellor then states the case with respect to the criterion for determining whether or not the particular use of the property he was then considering was a nuisance with respect to noise, thus:

"This raises the question whether a manufacturing establishment, which has come into a city block theretofore free of annoying noises and vibrations, may operate its machinery with the usual noise and vibration accompanying the same, during the hours of the night usually devoted to rest, if the effect of such customary noise or vibration at the unusual hour, is to keep awake those dwelling adjacent to the plant?"

He then quoted the following from Vice-Chancellor Pitney in *Gilbough* v. *West Side Amusement Co., 64 N. J. Eq. (19 Dick.) 28*:

"So, the time when a noise is made is also to be taken into account. Mankind needs sleep for a succession of several hours once in every twenty-four hours, and nature has provided a time for that purpose, to wit, the night time, and by common

consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances, under the circumstances, if made in the daytime, will be declared to be nuisances if made at night, during the hours which are usually devoted by the inhabitants of that neighborhood to sleep."

And in *Seligman* v. *Victor Talking Machine Co., supra* (at p. *700*), Vice-Chancellor Garrison said:

"It is not disputed in the case at bar that the noises and vibrations complained of exist, and that when the plant was in operation at night they seriously affected some of those in the neighborhood. The gravamen of the defence is that those who were thus affected were persons of extraordinary sensibility, and were not such as the law would protect by injunction by reason thereof."

And in reply to this argument of the defence, further continuing in stating the standard to guide the court, the vice-chancellor quoted Chancellor Zabriskie in *Ross* v. *Butler, 19 N. J. Eq. (4 C. E. Gr.) 294* (at p. *298*), as follows:

"The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance such as may offend the taste or disturb the nerves of a fastidious or over-refined person. But, on the other hand, it does not allow anyone, whatever his circumstances or condition may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim *sic utere tuo ut alienum non laedas,* expressed the well-established doctrine of the law. It is not necessary, to constitute a nuisance, that the matter complained of should affect the health or do injury to material property. It is sufficient, in the language of Sir Knight Bruce, if it is 'an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant and dainty modes and habits of living, but according to plain and sober and simple notions among the English people.' "

And disposing of the case then before him, Vice-Chancellor Garrison (at p. *701*) said:

"Confining the investigation solely to the witnesses who dwelt in the vicinity, and who were therefore subject to annoyance at night, there were produced by the complainant five witnesses, including the four members of his own family, who dwelt upon the Market-street side of the block, and who were seriously affected by the noises and vibrations at night and were kept awake thereby. The defendant produced nine witnesses from the Market street front of the block who testified that they were not annoyed or disturbed by the night operations. From the Second street side of the block the complainant and defendant each produced two witnesses, those for the complainant testifying that they were seriously annoyed and kept awake, those for the defendant testifying that they were not. Three witnesses were produced by the complainant who dwelt in adjoining blocks and who testified to the annoyances occasioned to them by the noises resulting from the night operation of the plant."

On this testimony the vice-chancellor disposed of the case, saying in commenting on the testimony (on *p. 702*) :

"As before pointed out, the complainant and his family described effects produced upon them by the annoyances which I cannot help but believe were largely mental or imaginary. But this does not in any way militate against the proven fact that the annoyances did exist and keep them from obtaining rest, and did render their dwelling practically unfitted as a place for rest; and, as previously said, the charge of over exaggeration which properly lies against the complainant's family in this respect, does not at all apply to the other witnesses produced by the complainant, each of whom was affected at night so seriously as to disturb his rest. The fact that others, either because they were differently situated with respect to the plant, or differently constituted physically, did not suffer a similar annoyance, does not deprive the complainant of his right to relief."

In *Rausch* v. *Glazer, 74 Atl. Rep. 39,* which was a nuisance case heard before me, and in which the question was as to stenches emanating from a rendering establishment, I took occasion to observe that the nuisance being established by satisfactory testimony, was not overcome by testimony of the nega-

tive kind; that testimony of some of the neighbors that they were not annoyed, did not disprove that the complainant and his family were annoyed.

In *Reilley* v. *Curley, 75 N. J. Eq. (5 Buch.) 57,* which was a suit to abate a nuisance created by noises only, in speaking with respect to the principle to be applied, Vice-Chancellor Garrison quoted Vice-Chancellor Leaming in *First M. E. Church of Cape May* v. *Cape May Grain and Coal Co., 73 N. J. Eq. (3 Buch.) 257,* then recently decided, as follows:

"While defendant is entitled to the enjoyment of its property in the pursuit of a lawful business, that business must be conducted with due regard to the well-recognized rights of surrounding property owners. When such business becomes creative of conditions which clearly render the appropriate enjoyment of surrounding properties impossible, the rights of others are invaded and equity will restrain the persistent pursuit of such injury."

And in declaring that noise alone may constitute such a nuisance as to subject the one creating the same to restraint in equity, he said:

"Of course, the character and volume of the noise, and the time and duration of its occurrence, and the place where it occurs, and the surroundings thereof, are the important and determinative features.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"This case also reiterates the well-settled principle which lies at the foundation of all this branch of the law, and which has been heretofore stated, namely, that the degree of personal discomfort is the determinative feature, and 'in measuring the degree &ast; &ast; &ast; all the surrounding circumstances must be taken into account in judging whether the degree is of sufficient importance to confer a right of action.' "

In the English courts the law is the same as in our own state, for there, smoke, noise and smells may severally constitute a nuisance and be ground for an action for damages or for an injunction. *Crump* v. *Lambert, L. R. 3 Eq. 409; Sturges* v. *Bridgman, 11 Ch. Div. 852; St. Helen's Smelting Co.* v. *Tipping, 11*

*H. L. C. 642; Walker* v. *Brewster, L. R. 5 Eq. 25; Broder* v. *Saillard, 2 Ch. Div. 692; Lambton* v. *Mellish (1894), 3 Ch. Div. 163.*

In *Lambton* v. *Mellish, supra,* which was a suit for an injunction to abate a nuisance arising from noise caused by the acts of two or more persons, it was held that such acts, taken together, may constitute such a nuisance that the court will restrain them all from doing the acts constituting the nuisance, although the annoyance occasioned by the acts of any one of them if taken alone, would not amount to a nuisance. And the court (at *p. 165*) said in reply to the argument that an injunction will not be granted to restrain a man from doing that which is lawful and which, if taken by itself, is no nuisance:

"If a man shouts outside a house for most of the day, and another man, who is his rival, * * * does the same, has the inhabitant of the house no remedy? It is said that that is only so much the worse for the inhabitant. On the ground of common sense it must be the other way. Each of the men is making a noise and each is adding his quantum until the whole constitutes a nuisance. * * * In my opinion, each is separately liable, and I think it would be contrary to good sense, and, indeed, contrary to law, to hold otherwise. It would be contrary to common sense that the inhabitants of the house should be left without remedy at law."

And in *Sturges* v. *Bridgman, supra,* the plaintiff was a physician, and his house was on Wimpole street, and the defendant was a confectioner in large business on the same street, and his kitchen was at the back of his house and stood on ground which abutted on the garden of the physician. The defendant used a pestle and mortar in his back premises, and the noise and vibration for more than twenty years were not felt as a nuisance, and were not complained of. But afterwards, the plaintiff erected a consulting-room at the end of his garden and then the noise and vibration became a nuisance to him. He accordingly brought an action for an injunction. *Held* (affirming the decision of Jessel, M. R.), that the defendant had not acquired a right to an easement of making a noise and vibration, and the injunction was accordingly granted.

When the case was before Jessel, M. R.—*11 Ch. Div.* (at *p. 854*)—he said:

"I think this is a clear case for the plaintiff. There is really no dispute as to this being a nuisance; in fact, the evidence is all one way, and, as has been often said in these cases, the plaintiff is not bound to go on bringing actions for damages every day, when he is entitled to an injunction."

In *Crump v. Lambert, supra,* the plaintiff was the occupier and the owner of a house in Walsall, in Staffordshire, and complained that the defendants had recently erected an iron factory adjoining his ground, the smoke, noise and effluvia proceeding from which occasioned a nuisance which he applied to the court to abate, and Lord Romilly, who was the master of the rolls—*L. R. 3 Eq.* (at *p. 412*)—said:

"I consider it to be established by numerous decisions that smoke, unaccompanied with noise or noxious vapor, that noise alone, that offensive vapors alone, although not injurious to health, may severally constitute a nuisance to the owner of adjoining or neighboring property; that if they do so, substantial damages may be recovered at law, and that this court, if applied to, will restrain the continuance of the nuisance by injunction in all cases where substantial damages could be recovered."

And in the same case (at *p. 413*), he said:

"The real question in all the cases is the question of fact, viz., whether the annoyance is such as materially to interfere with the ordinary comfort of human existence. The evidence shows, as indeed might have been expected from a house situated within the town of Walsall, although at the extremity of the town, that before the defendants erected their present works, a great deal of smoke and some noise occasionally affected the plaintiff's property, and that more or less of smoke is constantly in the neighborhood, arising from factories which have existed for more than twenty years; but after giving full consideration to all the evidence on this subject, I am opinion that the smoke of the defendant's factory has produced a completely new state of things as regards the plaintiff's house and grounds, and that the smoke and noise materially interfere with the comfort of human existence in the plaintiff's house and grounds. Indeed, I think

the evidence overpowering on this point, and that it is not really touched by the evidence adduced by the defendants."

And he ordered (at *p. 414*):

"An injunction to restrain the defendants, their servants, workmen and agents from allowing smoke and effluvia to issue from their said factory so as to occasion nuisance, disturbance and annoyance to the plaintiff, as owner or occupier of the tenement in the bill mentioned; and a similar injunction to restrain the defendants, their servants, workmen and agents from making, or causing to be made, noises in the factory, so as to occasion nuisance, disturbance and annoyance to the plaintiff, as the owner or occupier of the said messuage in the bill mentioned."

By the proofs in the case at bar the various grounds for equitable interference put in issue by the pleadings, are narrowed to three, and may be stated under the following heads— *first,* a nuisance said to be occasioned by smoke, cinders, soot and dirt; *second,* a nuisance said to be occasioned by offensive smells and vapors, and *third,* a nuisance said to be occasioned by noisy manufacturing.

For the sake of convenience, I will consider the proofs under the same three heads, to the end that there may be a separate adjudication on each particular thing or group of things said to have occasioned a nuisance.

*First.* Before further considering the proofs with regard to a nuisance said to have been occasioned by smoke, cinders, soot and dirt, the source or origin of the smoke (*i. e.,* from what part of the defendant's plant it was emitted) will be referred to, in view of the state of the evidence on that branch of the controversy, and also the terms "cinders," "soot" and "dirt" will be more accurately ascertained with respect to the source whence they originated.

A fact put in issue was whether or not any smoke was emitted from the defendant's five smokestacks, and considerable testimony was taken upon this subject. But I find upon the uncontradicted evidence of the defendant that it used a smokeless fuel under its boilers and coke ovens, and that, in consequence, the smoke emitted from these smokestacks was so inconsiderable in

amount as not to be worthy of consideration, and it will not influence my determination on this subject. And I further find that the terms "cinders," "soot" and "dirt" in the pleading and proofs mentioned, consist of small portions or minute particles of coal dust and coke dust.

The proofs are quite convincing that before and at the time of the filing of the bill, and afterwards down to the time of the completing of the taking of the testimony, the defendant generated large quantities of coal dust and coke dust by means of the coal handling apparatus with which the coal bunker is provided, during the handling of the coal and coke, from the time the coal was discharged from the boats on to the storage pile by the river, down to the time of the discharge of the coke from the coal bunker on to the coke storage pile along Front street, opposite the saloon of the complainant George P. Kroecker; that the defendant caused to be emitted large quantities of smoke from its ovens during the charging of the ovens with coal, and that this mingled smoke, coal dust and coke dust, was carried by the wind great distances over a large section of the city of Camden, spreading and diffusing into the houses and places of business of the complainants and others, within the circle upon which it fell, and over their back and side yards and grounds, and that thereby the complainants' houses were made dirty and uncomfortable to live in, and their furniture and house furnishings were damaged and injured.

On the evidence, the pollution of the atmosphere and the magnitude of that pollution from this source, are not open to dispute.

I shall not attempt to summarize or give the details of the complainants' thirty-two witnesses on this subject, inasmuch as their testimony is substantially uncontradicted, but will merely refer to the testimony of two or three of their witnesses for the sake of illustration, one of them being the complainant George P. Kroecker, who is perhaps one of the worst sufferers, if not the very worst sufferer, from the matters considered under this head. He testified that he had seen pedestrians, passing along Front street, who were obliged to turn and go the other way instead of passing the defendant's works, owing to the dirt and

dust, when the wind was blowing in a certain direction; that the defendant's operations would cause cinders and dust to come into his house, when the coal bunker and its accompanying coal handling apparatus was sieving coke in front of his property; that he had seen the smoke so bad that one could not see across the street; that it had been so thick that one could not even see across a room; that when the defendant was discharging soft coal from the boats on the river, if the wind was strong from that quarter, it took the dirt all over town; and that twelve hours after a fall of snow he had seen the snow in the neighborhood of the defendant's works covered with such a thick crust of cinders, black and gritty, that he could not see the snow.

Harry Charman, a witness on behalf of the complainants, testified as follows:

"Last September (*i. e.,* September, 1910) I was standing (in Mr. Kroecker's doorway) watching them load coke in a coal car and the wind was blowing right directly from the plant, and great volumes of fine grit from the coke, as they dumped it from the bucket to the car, would come over and go into his place; and while I was there he wiped his bar off during the time they were loading this car, which I think consumed twenty minutes, he wiped his bar off ten or fifteen times; you could write your name on his bar two minutes after he wiped it off. The engineer who was operating the steam shovel when he would empty the bucket, would have to run to get under a cover, under a screen or a canvas that was right in front of the cap, between the cap and the machine of the car, and wait until this volume of dirt and dust passed by, before he could go out and operate his engine."

August Freitag, another witness for the complainants, testified that he was a baker, and that in serving bread early in the morning in the neighborhood of the coke works, many a time he could not keep his eyes open owing to the soot and small cinders flying in his face coming from the coke plant and ovens, and he has seen it so bad that even a horse would not face it, but the horse would deliberately turn around and could not stand the

soot and stuff that came in his face, the whole air seeming to be full of soot.

This testimony serves to indicate the originating points in the defendant's works from which the things complained of emanate, and also to indicate the sphere of their distribution, and also the degree of intensity of the discomfort caused thereby.

In attempting to break the force of the complainants' testimony under this head, the defendant introduced the testimony of its general manager, and assistant general manager and superintendent, with respect to the construction of screens after the commencement of this suit, one along Front street, opposite the saloon of the complainant George P. Kroecker, and another on the coal bunker, which testimony I will set forth *verbatim* because of its importance in explaining the actual nuisance I am now considering.

(Here follows evidence omitted by direction of the chancellor.)

But such testimony, instead of overcoming the force of the complainants' testimony has, I think, exactly the opposite effect.

The situation presented by the proofs resembles that before the New York court of appeals in *City of Rochester* v. *Macauley-Fien Co. (1910), 199 N. Y 207, 211,* involving smoke alone, where that court said:

"The emission of smoke from a chimney when it includes dust, soot and cinders to such an extent that it is rendered very dark or black, must materially affect the purity of the atmosphere surrounding the place where it is so emitted. The pervading substances in the smoke necessarily darken the color in proportion with the amount thereof. As soon as the impelling force is removed such substances obey the law of gravity and fall upon the adjoining property. In a city or closely populated community, where persons and property cannot be removed from the effects of the disagreeable contamination, it not only pollutes the air that must be breathed, but it mars the appearance, destroys the cleanliness, and affects the value of the property within the circle upon which such substances from the smoke so fall. The extent of the injury is a matter to be

established by evidence, to include all the facts and circumstances relating to it, *although doubtless it is a matter of common knowledge of which the courts may take judicial notice that some injury must result from substance-laden smoke pervading the atmosphere in which persons and property necessarily remain.*"

It was attempted to be shown by the defendant in this case that there was more or less of smoke arising from other factories and from locomotives in the same neighborhood where complainants live, but after giving full consideration to all the evidence on this subject, and having regard to the smoke almost incessantly emitted from one or more of the defendant's one hundred and fifty coke ovens, day and night, and especially having regard to the unceasing activity of the steam bucket dipping up and dumping down soft coal and coke, a ton and a half at a time, each time creating a cloud of dust, day and night, as well as considering the enormous quantity of coal and coke thus handled every twenty-four hours, I am of opinion that the smoke from the defendant's ovens taken with the coal dust and coke dust produced by this coal handling apparatus, created a completely new state of things, as regards the complainants' premises, and that such smoke and dust materially interferes with the comfort of human existence in the complainants' houses, and, as seen in *Crump* v. *Lambert, supra,* these are separately actionable.

I conclude, therefore, that at the time of the filing of the bill, and before and afterwards down to the completion of the taking of the testimony, the defendant's works in this aspect of the case, that is, with respect to smoke, cinders, soot and dirt occasioned a nuisance of which each one of the complainants, being an owner or occupier of property in that neighborhood, has a right to complain, and from which they and each of them have a right to relief in this court.

*Second.* With respect to a nuisance alleged to have been created by gases, offensive odors, smells and vapors, it is not denied, but it is admitted by the answer, that during the time the six caps fitted for the charging holes of each oven are removed, and the ovens are being charged and leveled, some destructive

distillation of the coal is going on, and that during this period the resulting gases from this destructive distillation must of necessity be dissipated in the air.

These ovens are located immediately in front of the dwellings of some, and immediately in the rear of the houses of others, of the complainants.

Passing on to the defendant's testimony on this subject as given by its four most intelligent witnesses, all of them experienced gas engineers, namely, the general manager, assistant general manager, superintendent and assistant superintendent, with a view of ascertaining the length of the period of time this discharging in the air goes on, and the resulting effect:

(Here follows evidence omitted by direction of the chancellor.)

Up to this point, aside from the admissions in the answer, and the implications to be drawn from the large number of ovens operated continuously, night and day, with respect to gases escaping during the charging of the ovens, no clear view is given with regard to the character and intensity of the odors of which complaint is made.

But the complainants and their witnesses (numbering in all thirty-two, five of whom are physicians and members of the board of health) describe in unmistakable terms the physical effects of these fumes and vapors generated by the defendant's plant, upon those who inhale them, not only such as are emitted during the charging of the ovens, but also at other times.

Their evidence was that in certain conditions of the atmosphere and especially when the wind was from the northwest or river side of the defendant's works, and in the warm weather when windows and doors are kept open, the odor was very unpleasant, so much so, that they felt constrained to close their windows and keep them closed. This situation is serious. The complainants have the right to have the air come to them in a state of ordinary purity so that they may comfortably enjoy it.

On the evidence, the pollution of the air from this source, and the magnitude of that pollution is not open to dispute.

Without any attempt to go into details immaterial to the suit, it is proper to add, that I am satisfied, by a preponderance

of evidence, that the defendant's works as they were conducted in the year 1910, both before and at the time of the filing of the bill and afterwards, created a nuisance with respect to gases, smells and odors, of which each one of the complainants, being an owner or occupier of property in that vicinity, has a right to complain, and from which they all have a right to be relieved and protected by this court.

*Third.* Another of the allegations of the bill is that the defendant has in its service a large machine known as an "electric pusher" connecting with the coke ovens, which at frequent intervals, both day and night, makes loud noises, which are a nuisance to the complainants and the neighborhood, and which disturbs and deprives them of their sleep. But the proofs taken by both parties extended beyond the noise resulting from the operation of this pusher, and comprehended all noises generally, caused by operating the defendant's works. Accordingly, inasmuch as the bill prays for general relief, and the parties have thus acted, I will also deal with the case in this aspect, as they themselves have done, distinguishing such noises as are merely temporary and occasional, from those which are permanent and enduring.

For temporary inconvenience from noises caused by an occupier or owner of land in the execution of lawful works in the ordinary user of the land, are not ground for an injunction. *Harrison* v. *Southwark Water Co. (1891), 2 Ch. Div. 409.*

On this subject the defendant's testimony throws considerable light, both from the implications to be drawn from the magnitude of the apparatus in prosecuting defendant's work, and the improvements made by the defendant in this respect since the commencement of this suit. Assistant General Manager Ernshaw, who has been with the defendant upwards of five years, testified as follows:

(Here follows evidence omitted by direction of the chancellor.)

This testimony of witnesses on behalf of the defendant on the subject of nuisance created by noise emanating from the defendant's works indicates that considerable noise is there created, and, read in connection with the testimony of the complainants'

witnesses who say that these noises keep them awake at night, shows that an appreciable amount of noise, far too much, especially at night, creates a nuisance in the neighborhood which the law will redress.

On the evidence upon the subject of noises, I am satisfied that those described as explosions were temporary and occasional, and had ceased long before this suit was commenced. But with respect to those noises of a permanent character, and the intensity thereof, there is practically no dispute of the complainants' testimony, especially concerning the extent and effect of the noise created by the defendant's operations of the machines called pushers, motors and the steam bucket.

The testimony of the complainants and numerous witnesses called on their behalf, who all dwell in the neighborhood, is, that the noises proceeding from these sources interrupt and disturb their sleep, practically rendering it impossible to sleep in the neighborhood, as already remarked.

I will not go further into details beyond saying that I am satisfied by a great preponderance of evidence, that such noises occasioned by the pushers, motors and steam coal bucket are so considerable as to make out a case within the requirements of *Reilley* v. *Curley* and *Seligman* v. *Victor Talking Machine Co., supra.*

My conclusion is, with respect to noises of such a character and intensity as to disturb and deprive the complainants of their sleep during the night, that the defendant's works as they were conducted both before and at the time of the filing of the bill, and afterwards until the completion of the testimony, created a nuisance of which all the complainants being owners or occupiers of property in that neighborhood have a right to complain and to be relieved by this court.

I have had much hesitancy on the subject of injunction on account of noise in view of the damage of a possible stop to the defendant's business, if this plant be altogether restrained from operating after a certain hour at night, and until a certain hour in the morning, as was done in *Seligman* v. *Victor Talking Machine Co., supra,* where the defendant was restrained from operating its machinery "after the hour of ten-thirty P. M. and

from commencing the operation of the same prior to six-thirty
A. M.," but after careful consideration, I have concluded that
the complainants have a right to have the defendant restrained
from so operating its pushers, motors, coal bucket or other ma-
chines upon the premises in question between those hours as to
cause noise of sufficient intensity to penetrate the houses of the
complainants and destroy or disturb the sleep of those dwelling
therein during that portion of the night.

The defendant sought to escape from the effect of the com-
plainants' testimony by introducing testimony to the effect that
these things charged to be a nuisance, were not at all unpleasant
or disagreeable to other persons. But such testimony on the
part of the defendant utterly ignores the rule, that the charge
of a nuisance, if it be of things offensive to persons generally,
cannot be escaped by showing that to some persons such things
are not at all unpleasant or disagreeable, and such testimony
is wholly opposed to the criterion established in *Cleveland* v.
*Citizens Gas Light Co., supra,* where it is said that the thing
charged to be a nuisance "is not the less so, because there may be
persons whose habits and occupations have brought them to en-
dure the same annoyances without discomfort," and which was
acted on in *Laird* v. *Atlantic Coast Sanitary Co., Ross* v. *Butler,
Seligman* v. *Victor Talking Machine Co.* and *Rausch* v. *Glazer,
supra.*

Again, the defendant sought to escape from the acts com-
plained of by the so-called improvements made pending this
suit. But the rule on this subject is that when one who is en-
titled to relief in equity against a private nuisance files a bill to
enjoin the same, the defendant cannot, by partially abating the
nuisance pending the suit, defeat the complainant's right to
that complete redress to which he was entitled when he sought
his remedy. *Carlisle* v. *Cooper, 21 N. J. Eq. (6 C. E. Gr.) 576;*
*affirming 19 N. J. Eq. (4 C. E. Gr.) 257.*

It was argued that this court ought not to maintain jurisdic-
tion, but leave the complainants to their remedy at law. But,
as was said by the master of the rolls in *Sturges* v. *Bridgman,
supra,* "the plaintiff is not bound to go on bringing actions for
damages every day, when he is entitled to an injunction."

The defence of laches has not been set up by the defendant in its answer, and it could not have been set up with success, as was decided in *Laird* v. *Atlantic Coast Sanitary Co., supra,* in view of the proceedings by the complainants before the board of health.

The decree will be that immediately before and at the time of the filing of the bill, the defendant's works were so conducted as to create and maintain a nuisance as to each and every one of the complainants, being owner or occupier of a tenement in the bill mentioned or referred to, and that the defendant, its servants, workmen and agents be restrained by injunction from allowing smoke, coal dust, coke dust, gases or vapors to be emitted or escape from its works so as to occasion a nuisance, disturbance or annoyance to the complainants or any or either of them, as owner or occupier of a tenement; and that the defendant, its servants, workmen and agents be also restrained from working any pusher, motor or steam bucket and machinery in its works between the hours of half-past ten o'clock P. M. and half-past six o'clock A. M., so as to occasion a nuisance, disturbance or annoyance to the complainants, or any or either of them, as owner or occupier.

The complainants are entitled to their costs.