Complainants filed their bill to enjoin the defendant, Poultrymen's Service Corporation, from operating its poultry food manufacturing and processing plant in such a manner as to produce and disseminate meal, dust, dirt, foul odors, noises and vibrations, which complainants charge have constituted and do constitute a private nuisance injurious to them personally and to their property.
The complainants, husband and wife, and the defendant corporation own immediately adjoining properties on Flint Boulevard, in South Toms River, Ocean County. On the complainants' land there is a large building containing five stores and fourteen apartments. Complainants make their home in one apartment; they rent the others. The stores are all presently used by the complainant Anthony Kosich; therein he conducts a new and used furniture and house furnishing business. To the rear of the store and apartment building is a one-story building divided into private garages.
Defendant's land runs through from Flint Boulevard to South Main Street. Upon it stands a four-story, sheet-metal enclosed mill, a mash-mixing building, a grain storage building, and a garage. When the main building was erected it was made to face Flint Boulevard, but it was not built out to the building line. Subsequently, two dust collecting sheds were added to the front of the mill and a large cone-shaped dust collector was installed above them near the roof; also, two similar dust collectors were installed outside of the mill near the roof on the side facing the property of the complainants.
The defendant has always taken its delivery of grain from freight cars placed on a siding across Flint Boulevard from its mill and the property of the complainants. Originally grain was shoveled from the cars into trucks, carried over the boulevard and dumped into hoppers leading into the mill. In July, 1927, the defendant installed a vacuum grain unloading device to do this work and, in the summer and fall of 1943, it substituted therefor another system. Grain is now drawn by the vacuum from the freight cars into a flexible metal hose, thence through a metal pipe under the highway *Page 574 
and into the mill. The vacuum is created by a fifty horsepower electric motor operating an exhaust fan, and the air withdrawn from the pipe is released through a muffler into the outer air. Grain is carried from the pipe outlet into a tank containing a rapidly revolving cyclone cleaner; it then drops into a closed chute in which it is carried to a cleaning separator where any remaining dust is separated from the grain. This dust is drawn up through a pipe into one of the cyclone dust collectors on the outside of the mill where the heavier particles fall to the bottom and are carried into one of the dust sheds and the lighter dust is discharged into the outer air.
In addition to handling whole grain, defendant cracks corn and also grinds it into fine meal. The dust arising from such cracking and grinding, and from subsequent screening and grading, is forced by means of fans to one of the cyclone dust collectors installed on the outside of the building. There the heavier portions settle and are carried by an enclosed conveyor to storage bins; the lighter dust, in this instance, passes from the collector back into the mill and to a tubular dust collector, from whence it is carried to a storage bin.
Defendant also combines meat scraps, fish meal, bran and other ingredients in large mixers to form what is known as a dry mix. The ingredients are received in dry form in bags. Another appliance, known as a premixer, combines semi-solid buttermilk, fish oils and distillers' syrup into a wet mix. The wet mix and the dry mix are then combined to form what is known in the trade as a mash.
The bags in which defendant's products are sold are returned to the mill and are there cleaned by a motor-driven fan which sucks the dust from the bags. This dust also goes into a cyclone collector. The heavier portion of the dust is placed in bags; the lighter dust passes out of the top of the collector into the open air. The exhaust from the vacuum unloading system also contains dust. It is discharged through a twelve-inch pipe, equipped with a muffler, into one of the dust sheds. These sheds are fitted with wooden louvers and hung with burlap, and are designed to receive and retain all dust except such as may pass through the burlap into the open air. *Page 575 
The conditions of which complainants were complaining at the time they filed their original bill of complaint in this cause may be thus classified:
(1) Dust, dirt, meal, chaff and other grain residue emanating from defendant's mill, falling upon complainants' land and buildings and carried into their stores and apartments;
(2) Noise and vibration resulting generally from the operation of defendant's machinery and appliances, particularly the noises at the freight cars on the siding incident to the operation of defendant's vacuum grain unloading device;
(3) Foul odors from fermenting or deteriorating meal and grain residue. By their amended bill complainants added an additional complaint:
(4) That foul odors were emitted from feed ingredients used and stored in defendant's mill and from fish oils and skim milk in and draining from metal drums stored upon land of the defendant immediately adjacent to complainants' building.
The principles of law applicable to the facts disclosed by the evidence are well established. Some particularly pertinent statements taken from the reports are:
"`To enjoin the prosecution of a perfectly legal business on account of the noise made in conducting it, the evidence should be clear and convincing.'" Part of the first syllabus in Hey v.Seifert Baime, Inc. (Court of Chancery), 95 N.J. Eq. 502;123 Atl. Rep. 106, quoted with approval by the Court of Errors and Appeals in Benton v. Kernan, 130 N.J. Eq. 193;21 Atl. Rep. 2d 755.
"If the legal right is not clear, or the injury is doubtful, eventual or contingent, equity will give no aid." Demarest v.Hardham (Court of Chancery), 34 N.J. Eq. 469.
"Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained; and smoke, noise, and bad odors, even when not injurious to health, may render a dwelling so uncomfortable as to drive from it anyone not compelled by poverty to remain." Cleveland v. The CitizensGas Light Co. (Court of Chancery), 20 N.J. Eq. 201. *Page 576 
"But when we come to deal with what is individual property, in which the owner has an exclusive right, the case is different. While my neighbor may stand by my fence on his own lot and breathe across it over my land, and may permit the smoke and smell of his kitchen to pass over it, and may talk, laugh and sing or cry, so that his conversation and hilarity or grief is heard in my yard, he has no right to shake my fence ever so little, or to throw sand, earth or water upon my land in ever so small a quantity. To do so is an invasion of property and a trespass, and to continue to do so constitutes a nuisance."Hennessy v. Carmony (Court of Chancery), 50 N.J. Eq. 616;25 Atl. Rep. 374.
"The right of enjoyment [of private property] is surrendered in a factory district, only, to the extent of the inconvenience incident to the character of the business carried on there, no more. To be forced to suffer more is actionable." Wallace Tiernan Co. v. U.S. Cutlery Co., 97 N.J. Eq. 408;128 Atl. Rep. 872; affirmed, 98 N.J. Eq. 699; 130 Atl. Rep. 920.
"In the conditions of present living noise seems inseparable from the conduct of many necessary occupations. Its presence is a nuisance in the popular sense in which that word is used, but in the absence of statute noise becomes actionable only when it passes the limits of reasonable adjustment to the conditions of the locality and of the needs of the maker to the needs of the listener. What those limits are cannot be fixed by any definite measure of quantity or quality. They depend upon the circumstances of the particular case." Benton v. Kernan,supra.
Relief may be granted by injunction against a nuisance which deprives one of the utility of his land, thus appreciably impairing its rental and sale value, even though the loss cannot be spelled out in dollars and cents. Wallace Tiernan Co. v.U.S. Cutlery Co., supra.
If those who complain of a nuisance from the operation of a lawful business located in the vicinity of that business after it had been established and while it was operating, that is an element to be considered in judicially determining whether or not the comfort of the complainants in the use of their *Page 577 
property has been adversely affected to an unreasonable extent.Benton v. Kernan, supra.
Noises, vibrations, dust, dirt, and offensive odors have all been declared nuisances under certain circumstances in this jurisdiction. Some of the decisions in point are: Ross v.Butler (Chancery), (smoke and cinders, noise and offensive odors), 19 N.J. Eq. 294; Demarest v. Hardham (vibrations),supra; Hennessy v. Carmony (noises and vibrations), supra;Seligman v. Victor Talking Machine Co. (noises and vibrations), 71 N.J. Eq. 697; 63 Atl. Rep. 1093; affirmed on the opinion below, 72 N.J. Eq. 946; 73 Atl. Rep. 1118; Reilley
v. Curley (Court of Chancery), (noise), 75 N.J. Eq. 57;71 Atl. Rep. 700; Kroecker v. The Camden Coke Co. (Court ofChancery), (smoke, cinders, soot, dirt and offensive odors),82 N.J. Eq. 373; 88 Atl. Rep. 955; Wallace Tiernan Co., Inc., v.U.S. Cutlery Co. (vibrations), supra; Ross v. Denan (Courtof Errors and Appeals), (noises, smoke and offensive odors),101 N.J. Eq. 281; 137 Atl. Rep. 416; Friedman v. Keil (Courtof Errors and Appeals), (smoke, noise and odors), 113 N.J. Eq. 37; 166 Atl. Rep. 194; Abend v. Royal Laundry Service, Inc.
(Court of Errors and Appeals), (increased smoke, noise, vibration and soot), 122 N.J. Eq. 77; 192 Atl. Rep. 239;Melucci v. Egan (Court of Errors and Appeals), (noise and offensive vapors), 124 N.J. Eq. 241; 1 Atl. Rep. 2d 452;Benton v. Kernan (noxious odors, noise and vibration),supra.
 (1) DUST, DIRT, MEAL, CHAFF AND GRAIN RESIDUE:
The original bill in this cause was filed May 2d 1943. A circumstance which undoubtedly precipitated this litigation had occurred the month previous. For several days finely ground meal was released from a conveyor located outside of and near the top of defendant's mill into the open air. The conveyor was completely enclosed but, in this instance, a leak developed in the cover, the meal became damp, jammed in the conveyor and forced open a trap door provided for inspection and repair purposes. Dry meal was then driven directly *Page 578 
into the open air. Great quantities of the meal so ejected were deposited over the complainants' property and blown or carried into their stores and apartments. Mr. Kosich notified the defendant and had photographs taken showing the deposits. Upon notification, the defendant immediately located the trouble and eliminated it. Defendant retrieved more than a ton of meal from the roofs of its own buildings. This meal was a valuable ingredient of the poultry mash which defendant prepared and sold. How the officers and employees of the company had remained in ignorance of the situation for several days remains unexplained.
Another condition developed following the institution of this suit. Large openings were made in the metal siding of defendant's mill building preparatory to the installation of two cyclone dust collectors and, from the time the openings were made in the fall of 1943 until about January 20th, 1944, when the installation was completed, quantities of grain, chaff, meal and dust were permitted to pass from the mill into the open air and were carried to and deposited over complainants' property. When the dust collectors were completely installed the openings were permanently closed and the escape of dust and dirt at that point ceased.
The projection or escape of meal, chaff, dust and dirt from the defendant's plant was not confined to the two occurrences I have described. I am convinced by the weight of the evidence that it occurred on many other occasions, both before and after the institution of suit. In fact, some dust and dirt was released from defendant's plant at all times when it was in operation. Credible witnesses testified that fine dust was often observable in the air over the defendant's mill; that dust, fine meal and grain residue were carried by air currents from the mill over and deposited upon the property of the complainants and were forced under and around the doors and windows of the apartments and the stores; that the dust covered floors, walls, fixtures and furnishings therein; that the dust and dirt fell upon and soiled drying laundry of complainants' tenants; that it accumulated in passageways and upon porches and steps and, becoming damp, became slippery and dangerous under foot; and that all this resulted *Page 579 
in a condition adversely affecting complainants' comfort in the use of their property to an unreasonable extent and depriving them of its full utility. There is plenary proof in this case of an actionable nuisance inflicted upon complainants by the defendant in loosing into the air meal, grain residue, dust and dirt which was carried to and deposited over and upon complainants' property.
It is argued for the defendant that dust and dirt from drilling engines on the nearby railroad and from other manufacturing plants in the vicinity caused or contributed to the conditions of which complainants complain. While it appears to be the fact that dust and dirt were released into the air in this area from other sources, I am convinced that the obnoxious conditions I have described as existing upon complainants' property were caused by the defendant in the operation of its business. Kroecker v.The Camden Coke Co., supra, and cases therein cited.
 (2) NOISE AND VIBRATION:
Perhaps the most persistent, disturbing and annoying condition of which complainants complain is that which results and has resulted from the operation of defendant's vacuum grain unloading system. Complainants' witnesses vividly described the constant noise which is incident to the drawing of the grain from the freight cars into the flexible metal hose and the metal pipe. This noise was compared with the sound of coal sliding down a metal chute and to the roar of a diving airplane. Complainants produced a double-faced phonograph record to corroborate the oral testimony. While the character and volume of the sound therefrom could undoubtedly be controlled in reproduction, nevertheless it was not unlike that described by the witnesses. Also, defendant admits that when it is being operated the vacuum unloader creates considerable and constant noise. Defendant attributes the greater part of the noise to the impact of grain against the metal hose and pipe as it is forcibly sucked into them. Another noise results from the operation of the vacuum grain unloader: The air *Page 580 
is drawn from the end of the pipe in the mill by a fan operated by a fifty horsepower motor and is exhausted through a muffler into one of the dust sheds. The operation, the evidence established, sets up pulsations or vibrations in the air. This drumming sound is added to the noise at the freight cars, and they are caught and magnified by the metal walls of defendant's mill and can be distinctly heard inside the stores and apartments of the complainants.
Until about the year 1939 defendant operated its mill only from 7 A.M. to 5 P.M., and only on weekdays. The hours of operation were then gradually extended until, in 1940, defendant operated two shifts, one from 7 A.M. to 5 P.M., and the other from 5 P.M. to 3 A.M.; it also began operating on Sunday. When and after the bill was filed in this cause, defendant operated its grain unloading device throughout each day and during most of the night, seven days a week.
Defendant suggests that its present vacuum unloading system was purchased and installed to meet the complaints of the complainants respecting operation of the previously used vacuum unloader. However this may be, the proofs also show that the new system was installed in order to take care of the phenominal growth of defendant's business and to hold its trade. That business had been established in May, 1922, through the organization of a co-operative association of poultry farmers. In August, 1922, it did a gross business of only $1,000 per month; a year later it was grossing $15,000 per month. On December 31st, 1927, its assets, as shown by its books, were $109,964.97; on May 31st, 1943 (approximately the date of the institution of this suit) it valued its assets at $302,890.84.
Operation of the new vacuum unloading system reduced by about two-thirds the time required for the unloading of a given quantity of grain. It went into operation in December, 1943, and was thereafter ordinarily operated from 7 A.M. to 5 P.M. When, however, a heavy shipment of grain was received, the apparatus was kept in operation as late as 6:30 or 7 P.M. Such shipments were occasioned, defendant claims, by conditions due to the war; the necessity for day, night and Sunday operation, defendant alleges, resulted from these *Page 581 
heavy shipments and government and railroad requirements that freight cars be unloaded promptly. From and after December 20th, 1943, it appears, the unloading device was not operated after 7 P.M.
Tenants of the complainants and other credible witnesses testified that the constancy of the throbbing and the shrill noise of grain striking metal when the vacuum unloader was being operated interfered with or made impossible natural slumber in the apartments, and, that the noise interfered greatly with ordinary conversation in the apartments and stores. Except as it may be partially excused by reason of the fact that the properties of the parties are in a district zoned and favored for manufacturing (of which, more hereafter), the combination of noises and the vibrations or pulsations of the air constituted and they do constitute a private nuisance to the complainants.
There was considerable testimony, pro and con, on the question of noise resulting from the operation of machinery and appliances of the defendant within its mill. One noise was reported to the defendant by the complainants in 1941 or 1942. It was traced to the rubbing of a pulley or belt and was eliminated. Another noise was associated with a heavy vibration. This trouble was traced to the operation of a grain cleaning machine. Defendant admitted that this machine was then old and worn, that it was being operated to full capacity, and that it caused vibrations. Nevertheless, defendant continued to use the machine until sometime in the year 1943. It then removed the old machine and installed a new one, and the noise and vibration ceased. Before its elimination, the vibration was sufficient to jar mirrors and pictures from the wall in one of the complainants' apartments; there was some testimony that it also caused a crack in an apartment wall. I have no doubt but that, when this cause was instituted, vibration from the old cleaning machine was sufficient to constitute a nuisance injurious to complainants. There was no clear and convincing proof of any other noises or vibrations emanating from the mill which would justify a finding that an actionable nuisance resulted to the complainants. *Page 582 
 (3) FOUL ODORS FROM FERMENTING OR DETERIORATING MEAL AND GRAIN RESIDUE:
Complainants charge that foul odors resulting from the operation of defendant's mill constitute a legal nuisance. They say that one source of these odors is fermenting and deteriorating meal and grain residue. There can be no doubt but that foul odors of nuisance proportions did result from the fermentation and deterioration of the finely ground meal which was forced from the conveyor into the air and onto both the complainants' and the defendant's properties in April, 1943. The deposits of meal became damp and, fermenting or deteriorating, gave off nauseous odors. This conclusion finds confirmation in defendant's admission that its earlier attempt to dispose of grain dust and dirt by blowing it under its buildings was a failure because of the foul odors which followed. It is also possible that sufficient quantities of dust, dirt, chaff and other grain residue may have escaped from defendant's mill during the time that the dust collectors were being installed to have accumulated, deteriorated and given off foul odors, but the evidence relative thereto is not so clear and convincing as to warrant a finding of a nuisance thus resulting. Nor, is the evidence convincing that foul odors resulted from the fermentation or deterioration of meal, dust or dirt released from defendant's mill on any other occasions.
 (4) OTHER FOUL ODORS:
Complainants failed to satisfactorily prove that any odors given off by the dry mash ingredients stored and handled within defendant's mill resulted in a nuisance to them. With respect to the odors from skim milk and fish oils, the question must be resolved against the defendant. When and after complainants' amended bill was filed in this cause, the defendant habitually stored the metal drums from which it had taken cod liver oil and other fish oils, distillers' syrup, and skim milk, directly beside the northernmost wall of complainants' building. Defendant did not claim that any *Page 583 
attempt was made to clean these drums after use and before storage; apparently defendant was content to sprinkle lime regularly over the drums and on the ground. That foul odors were given off from time to time from the drums and the soil under and near them was established by the evidence. Before final hearing was had, it appears, defendant began storing the drums on another property at a considerable distance from its mill, but an actionable nuisance existed when and after this suit was instituted.
Defendant argues that no injunction should be advised against it touching conditions which, as it says, have been corrected. Chancellor Walker, in Kroecker v. The Camden Coke Co., supra, formulated and stated a rule which completely answers defendant's contention. The Chancellor declared: "* * * when one who is entitled to relief in equity against a private nuisance files a bill to enjoin the same, the defendant cannot, by partially abating the nuisance pending the suit, defeat the complainant's right to that complete redress to which he was entitled when he sought his remedy." See, also, Carlisle v. Cooper, 21 N.J. Eq. 576; affirming, 19 N.J. Eq. 256; Great Council of Improved Orderof Red Men of State of New Jersey v. Mohican Tribe No. 64, c.
(Court of Chancery), 114 Atl. Rep. 440 (not reported in the state reports); State, Lyndhurst Township Board of Health v.United Cork Co., 116 N.J. Eq. 4; 172 Atl. Rep. 347; affirmed,117 N.J. Eq. 437; 176 Atl. Rep. 142.
Defendant further argues that persons residing in the middle of an industrial and manufacturing town must expect to be subjected to discomfort; that a certain amount of noise, dust and vibration is inseparable from the operation of a feed mill; and, that complainants have suffered no actionable wrong because the amount of noise, dust and vibration given off in the operation of its plant has not exceeded the limits of necessary reasonable adjustment to the particular locality. Defendant cites and relies upon Benton v. Kernan, supra.
The section of South Toms River in which the properties of the parties are situated is, in fact, both a residential and a manufacturing district. Therein are not only many manufacturing and business establishments but also many small *Page 584 
homes and the fourteen apartments of the complainants. The borough, on January 20th, 1932, adopted an ordinance designating the area a manufacturing zone. It is significant that in that ordinance the municipal authorities included the provision "that no trade, industry, or purpose is permitted which in the opinion of the Board of Adjustment may create corrosive, toxic or noisome fumes, gas, smoke or odors or obnoxious dust, vapor, waste, or offensive noise or vibration detrimental to the public health, safety or general welfare."
The fact that an area has been designated by a municipality as a manufacturing zone gives no right to a manufacturer to inflict a nuisance upon his neighbors through the creation and dissemination of new, unusual and obnoxious noises, vibrations, dust, dirt and foul odors. Furthermore, in this case the proven fact is that the conditions complained of resulted in a large measure from the exceptionally rapid growth of defendant's business and the installation and operation, by it, of new machinery and appliances to care for and hold that increased business. The dust, dirt, meal, chaff and grain residue which I have found was forced or released into the open air by the defendant, some of which inevitably fell over complainants' property and was carried into their stores and apartments, the drumming of the vacuum exhaust and the noise from the unloading device at the freight cars, the noise and vibration from worn out machinery sufficient to annoy persons and to displace furnishings in complainants' apartment, and foul odors from fermenting meal, and from fish oil and spoiled skim milk, assuredly passed the limits of any reasonable adjustment between the needs of the defendant and the needs of the complainants. They cannot be said to be inconveniences incident to the character of the businesses carried on in the area, and they resulted in conditions injuriously affecting the comfort of complainants and of other average, normal individuals in the vicinity to an unreasonable extent.
In Friedman v. Keil, affirmed by the Court of Errors and Appeals, 113 N.J. Eq. 37; 166 Atl. Rep. 194, on the opinion below, Vice-Chancellor Berry said: "While the defendants' business was established long before the complainant came *Page 585 
into the neighborhood, and the right to object is consequently somewhat restricted, the business has been enlarged since that time and it cannot be said that she was required to anticipate such enlargement and submit to the increased annoyances incident thereto. Notwithstanding its lawful nature the defendant's business must be conducted with due regard to the rights of the adjoining property owners which include the right to reasonable rest during that time set apart for that purpose."
In the present case, the defendant's business was not established before the complainants' contracted to purchase their land. In fact, the use of complainants' premises for dwelling purposes antedated by many years the establishment of defendant's business. Complainants contracted to purchase their land in May, 1922. There was then on the land an old, three-story tenement building partly occupied. The building set back from and on an angle to Flint Boulevard. In 1927 and 1928 complainants moved the building forward and placed it parallel to the highway, they raised it, built five stores under it, rearranged the apartments and put in a new front. In 1940 a central heating system and plumbing were installed.
The Toms River Co-operative Association was established May 31st, 1922. At first it merely purchased grain and feed in car lots for its members, and deliveries were made directly from freight cars. In March, 1923, it contracted to purchase the land the defendant now owns; a small building was immediately erected and, in the same year, machinery was installed and the milling and mixing of grain inaugurated. The association continued this business until early in 1925, when the defendant corporation was incorporated to take it over. Having purchased the land, defendant immediately began the erection of the presently existing large, four-story mill building. Upon its completion additional milling machinery was installed, and from that time until the present defendant has prosecuted milling and processing operations therein. A grain storage building was built on defendant's property in 1926. In 1938 or 1939 another building, fronting on South Main Street, was added, and still later a garage building was built. *Page 586 
It thus appears that the use of complainants' premises for dwelling purposes antedated the establishment of the business now owned by the defendant, but that when complainants moved their building forward and improved it defendant's main mill building was in existence and grain milling and mixing operations were being conducted therein. Nevertheless, nothing in this situation required the complainants to anticipate the sudden and rapid growth of defendant's business and to submit to the increased noise, dirt and other annoyances incident to the speeding up of defendant's business, the installation of new and noise-producing appliances and the nuisance producing carelessness of defendant's employees.
Defendant lays stress upon the circumstance that complainants' apartments are maintained for and occupied by persons of very modest means. This is the fact, but it cannot advantage the defendant. The complainants, as residents in and owners of their building, are entitled to as much protection as they would be if their apartments were luxuriously appointed and occupied only by persons of wealth. Whether conditions complained of constitute a legal nuisance must always be determined by the pertinent circumstances of each case, but the wealth or poverty of individuals affected is not such a circumstance. Ross v.Butler, supra; Ross v. Denan, supra.
Defendant maintains that complainants should be barred of relief for laches. At the same time it admits that Mr. Kosich has been complaining to it of one or another of the conditions here discussed almost continuously since 1927. Defendant produced a number of witnesses to testify to these complaints and to show that it had successively remedied or attempted to remedy objectionable conditions. Complainants should not be penalized for accepting defendant's promises to better conditions or for refraining from litigation while defendant was trying out various devices designed to remedy these conditions and to meet complainants' complaints. "Since laches is an equitable defense, it will not bar a recovery where there is a reasonable excuse for the non-action of a party in making inquiry as to his rights or in asserting them." Mansfield v. Kraus (Court of Errors andAppeals), 101 N.J. *Page 587 Eq. 287; 137 Atl. Rep. 440. Something more than mere lapse of time is necessary to constitute laches which will bar the granting of injunctive relief. Such delay in order to constitute a bar must be unexplained, must be unreasonable, and it must have existed for such a length of time as to prejudice the defendant in presenting its defense. Massie v. The Asbestos Brake Co.
(Court of Errors and Appeals), 95 N.J. Eq. 298, 311;123 Atl. Rep. 155. "A nuisance originally slight but becoming increasingly more aggravating does not estop persons affected thereby, through laches, from maintaining a bill." Melucci v.Eagan, supra.
I shall advise a decree against the defendant enjoining it from projecting or releasing into the open air, at its mill and processing plant, dust, dirt, meal, chaff and other grain residue in such manner as to cause or permit those materials to be deposited upon the land and buildings of the complainants; enjoining the defendant from the operation of its vacuum grain unloading system on Sunday, and on weekdays before 7 A.M. and after 5 P.M.; enjoining the defendant from operating any machinery or appliances in or attached to its mill in such manner as to cause vibrations sufficient to damage the property of the complainants; enjoining the defendant from disseminating foul odors as a result of fermentation or deterioration of meal and grain residue; enjoining the defendant from doing any act or thing in, or in connection with, its premises in such manner as to result in the dissemination of foul odors, and particularly, enjoining it from so handling or storing, upon its premises, drums in which fish oils, skim milk and distillers' syrup have been received, as to result in the dissemination of foul odors. *Page 588